## A. B. MEDLIN et al. v. KATIE E. MORRIS, Appellant.

### Division One, May 31, 1912.

1. **HUSBAND AND WIFE: Property Purchased with His Money Conveyed to Her: Resulting Trust.** A suit by the husband to divest his wife of the title to property bought with his money and conveyed by the vendor to her, and to have the title vested in the husband, is not a case of an express trust, nor one where a trust arises *ex maleficio*, nor does it come within any of the bounds or definition of an implied trust where the question is between the original parties to the transaction.

2. ————: ————: **To Avoid Future Creditors.** A husband who invests his money in real estate in the name of his wife to avoid the hazard of business obligations and future executions, cannot, when they quarrel and separate, successfully maintain a suit in equity to have the title divested out of her and vested in him.

3. ————: **Property Bought by Savings Out of Allowances.** A court of equity will not take from the wife and vest in the husband property bought by her with the savings of money given to her by him as a gift to pay the family expenses, and through frugality and rigid economy saved by her, though in after years they quarreled and separated. He cannot, by afterthought, change the character of such a gift or marital advancement.

4. ————: **Resulting Trust: Character of Proof.** To divest out of a wife and put into her husband the title to real estate solemnly evidenced by deeds taken by the consent of both in the name of the wife and long acquiesced in, demands high and stringent proof to establish a resulting trust in his favor. To prove such trust there must be evidence clear, cogent and altogether convincing, so that the chancellor can say on his very conscience that an implied trust in his favor exists beyond any serious doubt.

Appeal from Buchanan Circuit Court.—*Hon. L. J. Eastin,* Judge.

REVERSED AND REMANDED (*with directions*).

*James W. Boyd* for appellant.

(1) The decree of the circuit court is not sustained by the evidence, is against the evidence and the weight of the evidence. (2) This case is here to be tried, if at all, upon the evidence before the court, and not upon a review of errors. It is to be tried *de novo,* according to the decisions of this court heretofore rendered in such cases. Miller v. McCaleb, 208 Mo. 562; Walther v. Null, 233 Mo. 110; Creamer v. Bivert, 214 Mo. 413; Chambers v. Chambers, 227 Mo. 262. This court, in equity cases, does not defer much to the opinion of the circuit court. Chambers v. Chambers, 227 Mo. 287. The circuit court, as a preamble to the decree stated what purports to be some of the facts in the case. This statement as to any material facts in the case, is not sustained by the evidence. A finding of fact has no place in a court of equity, and can have no influence on this court, which is to try the case upon the evidence introduced. Miller v. McCaleb, 208 Mo. 572; Walther v. Null, 233 Mo. 110. (3) As the respondent's case is based upon a pretended oral agreement, his evidence and all the testimony introduced by him does not tend to prove any cause of action in that respect and no trust in real estate can be created by oral testimony. R. S. 1909, secs. 2868-9; Crowley v. Crafton, 193 Mo. 431; Richardson v. Champion, 143 Mo. 538; Hillman v. Allen, 145 Mo. 638; Curd v. Brown, 148 Mo. 82. (4) It is not certain whether the petition bases the respondent's alleged right of recovery on an express trust or not. There is no evidence in the case sufficient to prove any trust. It is true that the respondent in his testimony claims that in 1892 he was sued. The suit "scared" him, and after he got

out of that, and the suit was thrown out of court, he says he concluded to turn over his home to his wife so that his future creditors could not take it away from him. He owned no lot then. This is the only oral arrangement which he claims to have made. He further testified: "Q. If you should escape a liability, then you wanted it for you and her? A. Yes, sir; that is the idea; yes, sir." He says that he and his wife both helped to make that money, and that what he said to his wife was to avoid future liability. A man cannot put his property out of his hands and have it conveyed to a third person in order to avoid present or future debts or financial liability, and then get a chancellor to get it back for him. Such a transaction is fraudulent, admitted to be fraudulent, and therefore no court of equity would assist him in enforcing his fraudulent, illegal and unjust agreement. The respondent in his testimony does not say, or pretend to say, that his wife ever entered into any such agreement, or ever said anything on the subject. Even according to his own testimony, she never entered into any such agreement with him. At least, he does not testify that she ever did enter into any agreement. Of course, he does not pretend to say what the agreement was so far as she was concerned. Green v. Cates, 72 Mo. 123; Sells v. West, 125 Mo. 630; Creamer v. Bivert, 214 Mo. 485; McNear v. Williamson, 166 Mo. 365; Chambers v. Chambers, 227 Mo. 286; Henderson v. Henderson, 13 Mo. 151; Ober v. Howard, 11 Mo. 425. (5) In a suit in equity to set aside a deed, the plaintiff asking such relief must prove his alleged cause of action by testimony so clear, express, strong and unequivocal as to banish every reasonable doubt from the mind of the chancellor respecting the existence of such trust. Reed v. Sperry, 193 Mo. 173; Curd v. Brown, 148 Mo. 92; Crawford v. Jones, 163 Mo. 583; Brinkman v. Sunken, 174 Mo. 709; Johnson v. Quarles, 46 Mo. 423; Adams v. Burns, 96 Mo. 361; Allen v. Logan, 96

Mo. 591; Burdett v. May, 100 Mo. 13; King v. Isley, 116 Mo. 155; McFarland v. LaForce, 119 Mo. 585; Plumb v. Cooper, 121 Mo. 668. (6) If he furnished any part of said money, the prima facie presumption is that he gave that money or the proceeds to his wife, and that he intended it as a purchase for her. Curd v. Brown, 148 Mo. 92; Woodward v. Woodward, 148 Mo. 246; Alexander v. Warrance, 17 Mo. 228; Gilliland v. Gilliland, 96 Mo. 522; Schuster v. Schuster, 93 Mo. 438; Kinzey v. Kinzey, 115 Mo. 496.

*John E. Dolman* for respondents.

(1) The trust sought to be enforced in this case is an implied or resulting trust arising out of "an agreement not made by one owning and having the legal title to real estate by which an express trust was attempted to be created, but it was an agreement prior to the vesting of title, an agreement which became a part of and controlled the conveyance, and evidence of its terms is offered not for the purpose of establishing an express trust, but of nullifying the presumption of an advancement and to indicate the disposition which the real owner intended should be made of the property." Institution v. Meech, 169 U. S. 409; Freeman v. Freeman, 153 Fed. 337. All of the property in controversy in this case was acquired subsequent to the agreement between the parties and in accordance with that agreement and by virtue of which the conveyance was made to the wife in each instance. Condit v. Maxwell, 142 Mo. 266. It is the collateral agreement prior to the payment of the purchase money, coupled with the ownership of the purchase money and the acts of the parties that determines the character of the trust. Shaw v. Shaw, 86 Mo. 594; McMurray v. McMurray, 180 Mo. 526. The proposition of law is undoubtedly true that the presumption of a resulting trust in favor of the purchaser is rebutted in case the conveyance is made to one to whom he is

under some moral or legal obligation, as wife or child, but "this rebutter of the presumption of a resulting trust, arising from the relation of the parties to each other, will itself be overcome when all the facts and circumstances antecedent to or contemporaneous with the transaction point clearly to an intention on the part of the purchaser to create a trust." Whether this conveyance carried with it a resulting trust depended altogether upon the defendant when he bought the land, paid the purchase money and directed the name of plaintiff to be inserted in the deed as grantee." Hall v. Hall, 107 Mo. 109; Richardson v. Champion, 143 Mo. 538; Butler v. Carpenter, 163 Mo. 597; Crawford v. Jones, 163 Mo. 577; Gray v. Jordan, 87 Me. 140; Williams v. Wagner, 64 Vt. 326; Bibb v. Huter, 79 Ala. 351; Keller v. Keller, 45 Md. 269; Gilchrist v. Brown, 165 Pa. St. 282; Lorensbuhy v. Purdy, 16 Barb. (N. Y.) 376; Avery v. Stewart, 136 N. C. 426. (2) Such an agreement must be proven by such clear and convincing evidence as to leave no reasonable doubt in the mind of the chancellor of its existence. Where, however, the question of the veracity of the principal witness is in doubt, and which must be judged very largely by her manner on the stand and her various contradictory statements, her falsehoods, if any, and all the circumstances attending the giving of her testimony, the chancellor who sees it all is the better judge, and this court should defer entirely to the finding of facts by the chancellor, if the evidence discloses the fact that this element entered into such finding, especially where her testimony is uncorroborated. Where any finding of fact in an equity case depends on the credibility of oral testimony the reviewing court should be satisfied that the finding is against the preponderance of the evidence before reversing it. Short v. Taylor, 137 Mo. 525; Trust Co. v. Browne, 177 Mo. 424; Creamer v. Bivert, 214 Mo. 479. (3) Appellant makes the further point that the agreement or arrangement

was void because made for the purpose of delaying, hindering or defrauding creditors and therefore equity will not relieve him of the position in which he has placed himself. There is no evidence that he had any creditors at the time the agreement was made. His only property consisted of a little four-room house, which he called his home. He wanted to save that. He never knew whether he would ever have anything else or not, and when he got out of his liability to an injured employee he concluded to turn this home over to his wife, so that if another accident happened that home could not be taken away from him. "That was the beginning of that arrangement." He did not know that the law guaranteed him a home and that his statutory exemption amounted to more than his little home amounted to. That was only the beginning of an arrangement, the inducement to enter into an arrangement, that was thereafter acted upon and carried out for fifteen years. The beginning of the arrangement was brought about by a fear that another accident might deprive him of his home. A conveyance to wife of a homestead can in no sense hinder, delay or defraud the creditors. Reed v. Nicholson, 189 Mo. 396. Even though it could be said that the arrangement between the parties hereto had its inception in a fraudulent conveyance, it is valid as between the parties thereto. Jacobs v. Smith, 89 Mo. 673. And defendant herein cannot allege its illegality for the purpose of avoiding it. McLaughlin v. McLaughlin, 16 Mo. 242; Hall v. Callahan, 66 Mo. 316; Thomas v. Thomas, 107 Mo. 459. If the arrangement in question was made for the purpose of defrauding future creditors none but the creditors themselves and those in privy with them can avoid it. McLaughlin v. McLaughlin, 16 Mo. 242. And if this action were by a creditor and the arrangement were held to be in fraud of him the court would simply hold that there was a resulting trust in

the plaintiff for the benefit of such creditor. Herrington v. Herrington, 27 Mo. 560.

LAMM, J.—James N. and Katie E. Morris were baron and femme. In 1908 said baron sued his femme in equity in the circuit court of Buchanan. The object and general nature of the bill was to declare a resulting trust in his favor in certain real properties, to divest title out of his wife and vest it into himself, and (in aid of the suit) to have a receiver appointed *pendente lite* to take charge, collect rents, insurance losses, pay taxes and make repairs. By amendment to the bill a certain policy on the life of plaintiff for the benefit of defendant, issued by the New York Life Insurance Company for $1000, was brought into the case as part of the subject-matter of the litigation. The said properties are described as follows: Lot 4 in block 15, Wyatt Park; lots 10, 11, 12 and 13, in block 137, South St. Joseph Addition; and lots 1 and 2 in block 15 in the same addition—all situate in the city of St. Joseph. There was a decree for plaintiff for all parcels except the last, to-wit, the two lots in block 15 in South St. Joseph Addition. The title to the latter was quieted in defendant. It was also decreed that defendant turn over said policy. By an intermediate order a receiver was appointed who seems to have made final settlement and received acquittance.

On due and timely steps, defendant appealed, giving a supersedeas bond.

After jurisdiction was lodged here, plaintiff died and A. B. Medlin, public administrator of Carroll county, in charge of his estate, and Mary S. Meister (a married daughter) the sole surviving child of the Morrises were substituted as plaintiffs and the cause stands revived in their names by stipulation. Throughout this case, however, for convenience sake we will speak of Mr. Morris as plaintiff.

The gist of the bill is that on sundry given dates

between 1892 and 1907 plaintiff purchased with his own means each of several tracts described, and caused title thereto to be put in defendant, his wife, to be held by her in trust for him and to his use and benefit. That title to some of the lots mentioned was acquired by defendant by an exchange of properties so held in trust. That thereafter, at a certain time in 1907, without cause, defendant left plaintiff and went to her own people in St. Joseph, thenceon refusing to live with him, repudiating the trust aforesaid and now claiming to own said real estate in her own right. We quote a part of the bill: "Plaintiff further states that at the time said conveyances and each of them were made there was a clear, express and unequivocal agreement between plaintiff and defendant that the title to said property should not be held by her in any other manner or in any other capacity than as the trustee for plaintiff, and that since the making of said conveyances and each of them and during all the times hereinbefore mentioned and until defendant left plaintiff and refused longer to live with him, the said defendant has recognized, admitted and acquiesced in said trust agreement; that all the money invested in said property and in all the improvements thereon was furnished by plaintiff and that defendant never invested a dollar of her own money therein and never had any money of her own to invest therein."

The answer joined issue on those allegations, admitting, however, that she held title.

The record is long and much of the testimony is in such conflict as to make the task of reconciling it a hopeless one. So, the discourse of some of the witnesses flies so high it cannot be followed without precaution against danger of disturbing judicial calmness. For instance, we are sorry it justly deserves such observations as these: If we believed everything testified to on both sides, by narration and suggestion, plaintiff would be a good husband, an industrious, so-

ber, successful mechanic and contractor, who never drank "to do any harm," who always made good wages and fair profits and who made it a rule to turn all he made over to his wife from the date of their marriage in 1880 down to their separation in 1907. *Contra*, and by the selfsame token, plaintiff would be an unsuccessful saloon keeper at the outset, then a mechanic generally running behind on his contracts, who made little above the expenses of his family, a frequenter of saloons nightly, a man who got drunk and into fights (in one of which the combatants rolled into the creek), who spent his substance in "gambling hells" and riotous living, and was an altogether indifferent husband. So, we would believe that defendant got her property start solely by an out-and-out gift of her father and mother, the O'Roukes, who were people of means and who often assisted her with money when she needed help. By the same token we would believe that the O'Roukes lived in a shanty, from hand to mouth, had no means to speak of and while they made small loans to the Morrises that were repaid, yet they never gave Mrs. Morris anything whatever as a gift or advancement. Again, we would believe that Mrs. Morris was assaulted and beaten "black and blue" by plaintiff's fists and that she left his home because of such unprovoked savagery. By the same token we would believe, *contra*, that she got (to use the words of Mr. Morris) "whooping drunk," was making a spectacle of herself in the house yard, and when in that pickle he left off reading his evening newspaper and with manly gentleness was trying to take her into the house to hide her shame, which polite but firm conjugal thoughtfulness she resented and without cause then and there left his bed and board once for all. Furthermore, we would believe that he never at any time laid as much as the weight of his hand upon her in anger; *contra*, listen to this from the record:

"Mr. Dolman: Don't you know, as a matter of fact, that Mr. Morris never laid a hand on you in his life? A. Indeed, he did; and I have been the mother of seventeen children, and they should have all been here today, with that daughter that is here against me; but he had kicked me around the prairies of St. Joseph, in those days, and I laid for nine months after that, one time when Walnut street was being graded; I was the mother of twins three different times, and during one of those times, at twelve o'clock at night, he abused me for going over and getting my horse— he was too cowardly to go and get the horse—."

Moreover, we would believe that Mrs. Morris (though not strong physically) braved snow storms to earn money by writing, by teaching, later by raising chickens and selling eggs, but that mostly by uncommon shrewdness, economy and thrift (and with but little financial aid from her husband) she took the property given her by her parents and by swaps, mortgages, saving her rents and untiring attention to her affairs, she added thereto and laid up against a rainy day in her own name all the property mentioned in the bill. *Contra,* by the same token we would believe that she was an invalid, frequently under the expense of a doctor's charge, not able to do her housework and was one who never earned a penny or had a particle of property except what she got from her husband's wages and the profits of his business. And so on and so on.

Fortunately much of the exaggerated color of the testimony of the immediate parties to the quarrel (we refer to the ladies of the Morris and Meister families, and to a sister of Mrs. Morris, Mrs. Craney) may be referred to that inflammation springing not unfrequently in persons of a certain temperament and environment when the sweet milk of domestic love and felicity is changed into the gall and bitterness of discord and angry strife over antagonistic claims to

property. Fortunately, too, the vital facts upon which plaintiff's case must stand or fall are, as presently seen, somewhat disconnected from those spectacular phases of the testimony, summed up and indicated as above, and lie within a small compass. Before leaving this feature of the case, it is not amiss to say that Mrs. Patrick Craney, born O'Rouke, a sister of Mrs. Morris, took her side in the controversy, while Mrs. Meister, the daughter (a married woman with three children), took her father's—the Morris and Meister people all living in the same household. Speaking of talking, the feminine persistency and factional zeal of those interesting ladies on the stand could be controlled, it seems, by neither the laws of the land nor by those of social usage, by neither court nor counsel, so that their testimony, by spells, was more voluble than valuable, more tart than true. To show the tension and color of feeling, breeding contradictions and feverishness, we will mention some incidents throwing light on the situation and, we think, justifying such conclusion. Mrs. Meister's given name was Mary. While on the stand she said she had heard her mother remark, when she was a little angry, that her father "didn't have any right around there and that what was there was hers alone." At such times "she always also made the remark that when he got old and couldn't work any more, that she wouldn't have him around her." At that point her mother raised her voice in open court to the effect following, to-wit: "Are you afraid of God, Mary? I raised you well but you don't show it." Referring to her eighty-year old grandmother who got hurt when her parents had their last quarrel, on the cross-examination of Mrs. Meister the record shows thus:

"Q. He pushed this lady, over eighty years old, into the wood pile? A. He had to do it, to protect himself from her.

Medlin v. Morris.

"Q. And when he pushed her into the wood pile, did she receive any wounds or bruises, or do you know? A. Well, I couldn't prove that. She had been hurt in a railroad wreck, and any marks she had I couldn't tell.

"Q. You saw marks, though? A. No; I thought she was just like a snake; I wouldn't touch her.

"Q. You left her lying there in a crippled condition? A. Why, she was not in a crippled condition. The next morning she came into our house.

"Q. You would not handle her on that occasion, would you? A. No; I don't believe I would touch her.

"Q. If she had been in a dying condition, you would not have touched her? A. No; I wouldn't.

Q. You would have seen her die there without trying to do anything? A. Yes, sir."

We are moved at this point to make a remark or two and pause long enough to do so, viz: The Scythians, it is said, *ate* their grandmothers when through with the old ladies, but Mrs. Meister would not even *touch* hers *in extremis*. She also had droll notions as to grandfathers' hats (and heads). *Vide* the following: After testifying that grandfather O'Rouke called her "pretty bad names," she said she "picked up a brick, threw it at him, knocking his hat off." At this point the witness, without leave, left the stand and courtroom apparently unseen by counsel, who, busy objecting and saving exceptions, had other fish to fry than to watch her movements. We think so because we find that Mr. Boyd, counsel for defendant, returning to his cross-examination, began a question as follows: "I will ask the question—" Thereat, interrupting, the court said: "Well, the witness is gone now, Mr. Boyd." Another witness for plaintiff, Mr. Nichols, took flame from the prevailing fire. He was asked by Mr. Boyd the following questions and made the following answers:

"Q. Then you say you never spoke to a human being concerning what you knew, and what you could testify to in this case, until you came on the witness stand? Do I understand you that way? A. Well, you can understand it that way if you want to.

"Q. Well, is it true? A. It is true! *God damn you.*"

These incidents might be added to from the testimony of others, but the above will suffice as an index to the welter of emotion at the trial, and which makes much of the testimony of the parties and their partizans of little probative force to convince the judgment or excite the conscience of a chancellor.

We shall not cumber the opinion with all the details of the testimony. To do so would be both impossible and unprofitable. A dispassionate and painstaking estimate of those features of it relating to the gist of the charge in the bill, we think is this:

Plaintiff by trade was a stone fitter. At the outset of his married career he was a saloonkeeper in Topeka, Kansas, but fell into financial misfortune, out of which he was assisted by his wife's parents. He then moved to St. Joseph, and thereafter plied his trade there and in that region as a mechanic, on wages at times, and at other times took what is called heavy contracting, such as house moving, doing stone work in the reconstruction of buildings, razing buildings, etc. In some of these contracts he made a profit, on others he apparently suffered losses. Sometimes he was out of employment. At a certain time while engaged on a contract, an employee was injured and brought suit against him and certain co-contractors for damages. At that time he owned a home in St. Joseph, a lot and a house of four rooms, and fell upon the plan of avoiding supposed danger from that suit by transferring his home to his wife. He carried out that scheme as to that property. Thenceforward, because of the risks and hazards of his business, he acted on the

plan, so adopted, of having no property in his own name subject to execution. In accordance therewith whatever money he turned over to his wife to invest was intended to be invested by her and was invested so as to effectuate that policy. We reproduce some of plaintiff's testimony, that, in the most favorable view possible to give it, outlines a plan of the kind we have described, thus:

"Q. Well, just state what occurred between you and your wife? A. Well, at that time, I was doing a little contract work at the Pacific Elevator Company, and there was a man accidently got hurt up there, and I had just a little four-room house at that time, and it was partially paid for, I don't think it was all paid for. Then this man got hurt, and they brought suit against me and the Pfeiffer Stone Company and the Elevator Company, jointly. It scared me to death. I just had a little home, and I thought we would save that and have that in our old age. I never knew whether I would ever have anything else or not, and after I got out of that they brought suit, of course, and the suit was throwed out of court, and my friends advised me then, they says: 'Here, you are out of this, and you don't know whether you are going to ever have anything else or not. You turn that home over to your wife, and you will have a home, and they can't take it away from you.' That was the beginning of that arrangement.

"Q. Now, at that time, did you have an understanding with your wife, as to that? A. Yes, sir.".. "Mr. Dolman: Mr. Morris, who furnished the money to purchase all of this property. A. Well, I think that I furnished it. I have been the only earner. . . A. Well, I always brought money home, and it was the understanding that she was to settle all of the accounts and look after general matters and such things. Q. Now, when property was purchased by her, what

243 Sup.—18

was said about it? A. Well, whenever a piece of prop-
erty was to be bought, we went together and talked the
matter over and advised among ourselves. Of course,
we got along very happy and all right that time, and we
talked the matters over, and talked about how it was
best to do, and how best to use our money. Q. And
who would make the deal? She or you? A. Well, I
made most of the deals, myself. Q. Who would carry
out the contract? A. Well, when it came to paying
out the money, she had the money in her clothes or
pocket, and she would pay the money. Q. And take
the deeds? A. Yes, sir, it was the understanding that
the deeds were to be taken in her name. Q. Did Mrs.
Morris have any money when you married her? A.
No sir, not a cent, to my knowledge. Q. Has she had
any money during her marriage, other than what she
procured from you? A. Nothing in the world, sir.''

On cross-examination, plaintiff testified in part as
follows:

''Q. Let me finish my question. And in order to
better protect yourself from liabilities which might
accrue, and avoid the payment of any liability which
might arise, you concluded to buy property and take
the deeds in your wife's name. Is that correct? A.
It was an understanding between——. Q. No, I want
an answer to my question. A. I don't understand
your question. Just ask the question in a clear way,
and I will try to answer it. Q. Yes, sir, I will do so.
You were in hazardous business? A. Yes, sir. Q. And
you were liable to be sued on account of some injury
or some accident which might befall somebody working
under you, or with you or for you, or working for
somebody else, that your men might hurt? A. Yes,
sir; I might be brought into something of the kind.
Q. In fact, you were brought into one lawsuit? A.
Yes, sir. Q. And the moment you got through with
that lawsuit, you concluded that it was probable that
you would be sued again, and that the property you

should have or should get, you would put in your wife's name?  A.  Yes, sir, I would save my home.  Q.  And that was to avoid future liability to any person to whom you might be indebted?  A.  Yes, sir.  Q.  So that you then began putting the property in her name, on that basis, that early?  A.  Yes, sir, that is right. Q.  And then you continued that, up to the time the last piece of property was put in her name?  A.  Yes, sir; it was an agreement and understanding between I and her.  As I earned a little money, we went together and invested, and it was invested for I and her, for our mutual home and happiness.  Q.  You both helped to make money.  A.  Well, I don't know; she was my housewife, and took care of my house; she made no money otherwise.  Q.  She helped you make this money, by taking care of your family, and raising your family?  A.  Yes.  Q.  Well, you didn't actually pay her any wages?  Her services toward the maintenance of the family were worth pretty near as much as yours, weren't they?  A.  I am not able to answer that part. I don't know; I will leave that to somebody else to answer that.''

The above puts the position of plaintiff on the question of a resulting trust in the very best light allowable.  We are not satisfied that the properties so put in the name of defendant were wholly paid for by the earnings of plaintiff.  To the contrary, our conclusion is that defendant's parents assisted her in acquiring some of it, and that some of it was purchased with her savings from her own rents and the odds and ends of her savings from wages given to her by plaintiff.  She seems to have been left to manage her household affairs and family expenses the best she could out of her husband's earnings, most of which, we think, were turned over to her by him to run the house or pay his debts—she acting as his time-keeper, bookkeeper and paymaster.  That she was a phenominally frugal housewife with an eye to laying by, we

are convinced. Her sister called her "an extremist in economy" and we will let it go at that. Maybe that is where the marital shoe pinched. We think it is a fact also that in some instances she bought property on her own initiative and in others on his, and that generally they consulted with each other on business matters of that character. Both had sharp and unruly tongues with rough sides (hers the sharper of the two). They now and then forgot the precept that to return abuse for abuse is but to heap mud on mud. Both had other failings, but we may as well put them to one side, for the law of the case does not hinge on them, and a woman in this court is to have a little latitude if she is the mother of seventeen children. There came a time when they no longer agreed at all as spouses, but (more's the pity) had a bitter quarrel and their paths parted forever. Close observers of the phenomena of human nature have noticed that sometimes quarrels exhaust themselves with excess of fervor and fury and thereby die out. So, peradventure, pots (boiling too fiercely) boil over, put out the fire underneath and cool off. But this quarrel was not of that sort. It seems to have run from words to blows and made reconciliation impossible between these two old folks. This climax did not happen spontaneously. It had a history and things grew little by little until the explosive catastrophe came. Who was to blame we do not know, and if we did know we could not say that such knowledge would materially assist in determining facts looking to an alleged resulting trust, or in applying the law to those facts.

As we understand the brief of learned counsel for plaintiff, he does not now contend that the decree was right in so far as it took from defendant the old-line policy of insurance on the life of her husband in which she was beneficiary. He does contend, however, that in other particulars the decree was equitable and supported by recognized equity principles.

It will be observed, moreover, that the chancellor did not divest title out of defendant and vest it in plaintiff as to one piece of real estate.  We have looked into that matter with circumspection and care, with the result that it seems to us, on this record, that if plaintiff made a case on any tract he made one on all; and if, on the other hand, defendant's title was good as to one tract it was good as to the others.  We can not determine this case on the theory of winding up an imaginary partnership.

There are cases in the books where A turns over to B money to invest for A.  Where B, in such case, invests in favor of himself, A is not without remedy in equity.  Manifestly this is not a case of that sort. There are other cases where a trust arises *ex maleficio*. Manifestly the instant case is not one of that kind. Nor is it a case of an express trust.  Nor does it come within any bounds or definition of any implied trust with which we are familiar, where the question (as here) is between the original parties to the transaction.  If creditors in their own right had filed a creditors' bill, then we would have another question to deal with.  But this case is on appeal, on a decree on Mr. Morris's bill, and his administrator, on such appeal, can have here no right decedent would not have had below.  If plaintiff, as the testimony strongly suggests, invested his accumulations in the name of his wife to avoid the hazard of business obligations, thereby subjecting his means to hazards arising from matrimonial infelicity, that was his affair and does not concern a court of conscience on his complaint.  He should have looked before he leaped and taken care not to jump from the frying pan into the fire.  If, as some of the evidence indicates, plaintiff gave to his wife as a gift such increment of his wages as accrued to her through salvage from debt-paying, or from frugality, then that does not concern a court of conscience on his complaint.  Will a chancellor, on his complaint,

be less generous than he was with his own wife? He could give and she could get, unafraid of the law as between themselves. Running through the whole gamut of this case is the dominant note that plaintiff from time to time intended what he gave his wife as an advancement or gift to her—an offering on the altar of connubial peace and bliss. He may not now, by afterthought, change the character of those transactions. To divest out of a wife and put into her husband the title to real estate solemnly evidenced by deeds taken by the consent of both (a consent long acquiesced in) in the name of the wife, demands high and stringent proof to prove a resulting trust. To prove such trust calls for evidence clear, cogent and altogether convincing, so that the chancellor can say on his very conscience that an implied trust exists beyond any serious question. The testimony in this case falls far short of that character of proof, and falls far short of sustaining the substantive allegations of plaintiff's bill.

We conclude the decree was for the wrong party. Therefore, so far as it was in favor of plaintiff, it is reversed and the cause is remanded with directions that plaintiff's bill be dismissed. It is so ordered. All concur except *Valliant, J.,* absent.