ALICE W. MILLER, by OTTO HAMPE, Guardian, Appellant, v. A. C. MILLER and WILLIAM GUETEBIER.

In Banc, November 25, 1925.

1. **APPELLATE PRACTICE:** Review of Evidence. In a suit in equity the appellate court may and should review the evidence as though the case were before it *de novo.*

2. **PARTNERSHIP:** Existence: Intention: Character of Proof. Where there is no written agreement between the parties it is often difficult to determine, as a matter of law, whether a partnership was created. Scarcely any one fact is decisive of the question. Participation in profits and losses does not *per se* constitute a partnership. Testimony that the parties were partners or that the

business was a partnership business, is a legal conclusion, and does not establish the fact that the relation between the parties was that of partners. The relation depends upon the intention of the parties, and their conduct towards the business and each other, and can be created only by contract, and where plaintiff asserts that by oral agreement she and defendants entered into a partnership in a joint business, and demands an accounting, the burden is upon her to establish the existence of the partnership by clear and decisive proof.

3.. ———: ———: **Proof: Conclusions of Witness: Profits.** Statements by plaintiff relative to an alleged oral agreement between her and her husband and the other defendants which are mere statements of legal conclusions and not statements of ultimate facts tending to show the creation and existence of a partnership between her and them, and testimony detailing no conversation from which the terms and conditions of a partnership contract between her and them may be fixed, are not sufficient to show the existence of a partnership in an established grocery business conducted by defendants, in the labor of which she assisted for some years. And plaintiff's testimony that she was to share in the profits of the venture, where the record is devoid of any agreement upon her part to share in the losses, does not supply the insufficiency of such statements.

4. ———: ———: **Advancing Husband Money.** The fact that plaintiff advanced or loaned her husband money which he combined with an equal amount put up by the other defendant and with him engaged in merchandising, is not sufficient to show that she was a partner in the business, especially where there is no testimony that the other defendant knew of such advancement or agreed that she was to be a partner, although she worked in the store without salary.

5. ———: ———: **Signing Deed.** The fact that defendant and plaintiff's husband were partners in the grocery business and bought a store, taking the title in their own names, and gave a note, secured by a deed of trust, in part payment, both of which were signed by plaintiff and the wife of the other, and that the business was thereupon moved into the store and the note afterwards paid out of business profits, is some evidence that plaintiff was a partner in the business; but where the record is silent as to why she signed the note, and her joining in its execution may be explained on other reasonable grounds, it is not sufficient to show that a contract creating a partnership between her and such defendants was ever entered into.

6. **PARTNERSHIP**: Existence: Working without Salary. The fact that plaintiff, without salary, worked in the store conducted by her husband and another, does not establish a partnership between her and them, where she further testifies that she was "to help him work and keep from paying salary."

Corpus Juris-Cyc. References: Appeal and Error, 4 C. J., Section 2647, p. 726, n. 17; Section 2651, p. 728, n. 45. Partnership, 30 Cyc., p. 352, n. 9; p. 353, n. 13, 14; p. 360, n. 64; p. 369, n. 7; p. 412, n. 6 New, 7, 8; p. 413, n. 14, 15; p. 414, n. 23 New.

Appeal from St. Louis City Circuit Court.—*Hon. Robert W. Hall*, Judge.

AFFIRMED.

*Abbott, Fauntleroy, Cullen & Edwards, Taylor R. Young* and *August M. Brinkman* for appellant.

(1) The existence of a partnership is a question of intention and when there is no specific contract of partnership the court will look at the entire transaction, and from that, in the light of the surrounding circumstances, determine the intention of the parties. Torbert v. Jeffry, 161 Mo. 645; McDonald v. Matney, 82 Mo. 358; Distilling Co. v. Wilson, 172 Mo. App. 612; Willoughby v. Hildreth, 182 Mo. App. 80. (2) Where partners mutually contribute capital or service or both to an enterprise, the sharing of profits is prima-facie evidence of a partnership. 35 Cyc. 414, and note 20; Torbert v. Jeffry, 161 Mo. 645; Nugent v. Armour Packing Co., 208 Mo. 498; Bank v. Altheimer, 91 Mo. 180; Grocery Co. v. Barry, 58 Mo. App. 665; Distilling Co. v. Wilson, 172 Mo. App. 612; Willoughby v. Hildreth, 182 Mo. App. 80.

*Fish & Fish* for respondents; *James T. Roberts* of counsel.

The existence of a partnership is never assumed and in a contest between alleged partners the proof of the partnership must be by the clearest and most positive

evidence.   Jones v. Bruce, 211 S. W. 692; Chapin v.
Cherry, 243 Mo. 375; Whittling v. Schreiber, 202 S. W.
418; Fuel Co. v. Brady, 208 S. W. 151; Mackie v. Mott,
146 Mo. 230; Ingals v. Ferguson, 59 Mo. App. 299.

SEDDON, C.—Action in equity for the appointment
of a receiver of an alleged partnership and for an ac-
counting, originally commenced by Alice W. Miller, wife
of respondent A. C. Miller, as plaintiff.  The salient al-
legations of plaintiff's petition are as follows:

"Plaintiff states that she is the wife of the defend-
ant, A. C. Miller, and that on or about the ―― day of
December, 1910, plaintiff and the defendants agreed to
form a co-partnership under the name of A. C. Miller
Grocery Company, plaintiff and defendants each to have
a one-third interest therein and to equally share the
profits and losses of said business; that plaintiff and the
defendant A. C. Miller contributed their portion of the
capital towards said enterprise and the said co-partner-
ship of A. C. Miller Grocery Company was launched at
6006 Kingsbury Boulevard in the city of St. Louis, Mis-
souri, but whether the defendant William Guetebier ever
contributed any capital towards the co-partnership this
plaintiff is unadvised; that thereafter, and to this date,
said co-partnership has been conducting a retail grocery
store on Kingsbury Boulevard in said city and has pros-
pered; has accumulated a large stock of groceries of
the reasonable market value of twenty thousand dollars
and has no debts; that from the profits derived from the
operation of said co-partnership business valuable real
estate has been acquired, and the title thereto has been
taken in the name of A. C. Miller and William Guetebier,
and which said real estate is situated in the city of St.
Louis, State of Missouri, and is more particularly de-
scribed as follows, to-wit:  [Here follows description of
land.]

"Plaintiff further states that said foregoing de-
scribed real estate is of the reasonable market value of
thirty thousand dollars.   Plaintiff further states that

311 Mo. App.—8.

she and the defendants have been operating said grocery store since the date of the organization of said co-partnership as aforesaid, and plaintiff and the defendant A. C. Miller have contributed their time towards said enterprise without any compensation whatsoever, until the 28th day of October, 1921, at which time the defendant A. C. Miller permitted an employee of said grocery store to assault the plaintiff, which resulted in plaintiff being confined to her bed and incapacitating her from doing any other further work in said co-partnership store, and now the defendant A. C. Miller denies that the plaintiff has any right, title or interest in any portion of said co-partnership assets, although he is willing to pay to the plaintiff one-half of the interest which he holds and claims to have in said co-partnership if she will obtain a divorce from the defendant A. C. Miller. Plaintiff further states that the defendant A. C. Miller is squandering the assets of said co-partnership and using the funds of said co-partnership for purposes of dissipation, and unless this Honorable Court will appoint a receiver to take charge of the said co-partnership and the assets thereof and wind it up, pay its debts and account to each of the partners as their interest may appear, plaintiff will lose all her rights and interest in and to said co-partnership business, including the real estate belonging to said co-partnership hereinbefore described. Plaintiff further states that the defendants and each of them have so manipulated said co-partnership during the past two years as to deprive the plaintiff of any profits and income derived from the operation of said grocery store; that she has no adequate remedy at law and without the intervention of a court of equity she will lose all her right, title and interest in and to said real estate and said business, including the profits and income therefrom during the last two years. Plaintiff further states that the defendants have taken the funds of the said co-partnership, the exact amounts of which and the dates when taken are to the plaintiff unknown, but plaintiff alleges that said sum is in excess of ten thousand dollars, and

have invested the same in their own personal enterprises."

The prayer is for the appointment of a receiver to wind up the affairs of the alleged co-partnership, convert the assets into cash and, after the payment of its debts, that the proceeds be divided among the alleged partners as their several interests may appear, and for an accounting.

Respondents joined issue by answering as follows:

"Now come the defendants and each of them and file this, their answer, to the petition filed in this cause. The defendant A. C. Miller admits that the plaintiff is his wife, and that a partnership was entered into between A. C. Miller and William Guetebier, on or about December, 1910, under the name of the A. C. Miller Grocery Co., and that they are still conducting said business and partnership at 5947 Kingsbury Ave., in the city of St. Louis, Missouri. That the profits of said partnership in said business have been invested in real estate as alleged in the petition and that the said real estate is in the names of A. C. Miller and Wm. Guetebier, who jointly hold title in said real estate, and that said real estate is free of all incumbrances and debts, and that said grocery business is in a profit-sharing condition and is not subject to any debts with the exception of monthly current bills and that business is in a solvent condition, and each of said defendants deny each and every other allegation as contained in said petition."

Plaintiff's reply was a general denial.

Only one witness, the appellant, Alice W. Miller, plaintiff below, testified on the trial. As we read the record, her testimony, insofar as it is material to the question raised on this appeal, is substantially as follows:

Plaintiff is the wife, and defendant Guetebier is the brother-in-law, of defendant Miller; plaintiff, before her marriage, had worked as a domestic servant and from her earnings had saved several hundred dollars, which she deposited from time to time in a savings account with St. Louis Union Trust Company. After her marriage

with defendant Miller, she continued working and deposited her earnings, or the greater part thereof, in her personal savings account. On June 17, 1908, she withdrew from this account $1,000, which she loaned to the mother of defendant Miller. In May, 1911, the loan was re-paid to plaintiff and the money was used "to go into the grocery business with Elmer Knestead, under the name of Knestead & Miller; defendant Miller had no money and plaintiff used the $1,000 to go into the grocery business with Elmer Knestead." Her exact testimony with reference to this business venture may be better expressed in her own words:

"Q.   Who went into business?   A.   Mr. Miller and I, and Elmer Knestead.

"Q.   Under what name did you go into business? A.   Knestead & Miller.

"Q.   (By THE COURT):   What I want to find out is what was said at the time you opened up that store; do I understand there were three of you in the business at that time?   A.   There was Mr. Miller and Knestead, and *I was backing Mr. Miller to put the money in*—he and I were partners.

"Q.   (By THE COURT):   Now, if I understand, did you say there were three of you went into business together?   A.   Mr. Knestead, Mr. Miller and myself.

"Q.   Did you loan this money to your husband? A.   I went in 50-50 with him."

Witness testified she did not remember exactly what the conversation was, except that she was "to go up and help him work and keep from paying salary and it was understood that they were to share 50-50."

"Q.   (By THE COURT):   Everything he owned was his and what was yours was his also; that is the old common-law?   A.   It used to be, but it is different now.

"Q.   (By THE COURT):   Well, I am trying to get at what conversation you had there, how you went into business together, what was said about it?   A.   Well, there wasn't anything in writing; that is the reason things—just simply went in there and bought this, and

paid that, and there was no receipts for it; never was a disagreement there, so it was either buy or sell there.

"Q.    What was said between you and Mr. Miller and Mr. Knestead about what amount of money—

"Q.    (By THE COURT): How the business was to be run, and what was to be done with the moneys derived from the proceeds? What was said between you three people about that? A.    Well, I talked to Mr. Miller; it was simply left, everything mostly for his judgment; I was just simply doing whatever he asked, told me to do.

"Q.    Well, wasn't Knestead, wasn't there anything said about what interest Knestead was to have? A.    They had a half.

"Q.    He was to have half? A.    Mr. Miller and Mr. Knestead.

"Q.    What were you to have? A.    I was to get in, a half of Mr. Miller's.

"Q.    Well, that is the point—did Mr. Miller have a talk about that. A.    Yes.

"Q.    What did he say, and what did you say? A.    I was to give my services there, and help him, and half to be mine, and half to be his."

The interest of the Millers in the Knestead & Miller store was sold to Knestead in October, 1911, for $1,800, and with that money a grocery store was opened by Miller and operated under the name of A. C. Miller Grocery Company, at 6006 Kingsbury Boulevard, for five years, when the lease expired and the business was moved across the street into a new building at 5949 Kingsbury Boulevard, where the business had since been conducted under the same name. Of the $1,800 received from Knestead, $900 was used in buying fixtures for the new store and $900 was deposited in the bank to the account of A. C. Miller Grocery Company. The lease at 6006 Kingsbury Boulevard was taken in the name of A. C. Miller. When the store was moved across the street to its present location, Guetebier was "supposed to go into business with defendant Miller and the plaintiff and to put in $1,250 and was to take a half interest."

"Q. (By THE COURT): Well, what was said by you at the time that Mr. Guetebier, what interest was he to take? A. Half and half; he and his wife.

"Q. He was to take half and Mr. Miller half? A. Yes.

"Q. Well, you said something about his wife? A. Yes, Mr. and Mrs. Guetebier and Mr. and Mrs. Miller, it was a partnership of the four of us.

"Q. (By THE COURT): Was it understood that way? A. Yes, sir.

"Q. What was said at that time? A. They was to go half and half and she was to work; and so was I, and Mr. Miller worked on the outside, or on the inside, and Mr. Guetebier was on the outside."

Plaintiff did the banking for about five years and never drew any salary, but Guetebier and Miller each drew $10 per week for two years and, after that time, "everybody had access to the cash drawer and took whatever they pleased and that is what caused the disagreement; there never were any settlements made between the partners." The real estate and building were paid for out of the profits derived from the operation of the store, the title being taken in the names of A. C. Miller and William Guetebier, who continued to hold the title from the time of the purchase until the trial of this action. When the store building was erected, $11,000 was borrowed for that purpose, secured by a deed of trust on the real estate, and the notes and deed of trust were signed by Miller and his wife and Guetebier and his wife. The notes and deed of trust were subsequently paid off out of the profits derived from the operation of the A. C. Miller Grocery Company. Before it was agreed that Guetebier should take an interest in the business, plaintiff objected to Guetebier becoming a partner, and a Mr. Wilder, a former employer and friend of plaintiff, told Miller that he didn't think any partners were needed and that Miller and his wife "could go it alone." Miller, however, did not agree to take Mr. Wilder's advice and said he thought he needed an inside man and an outside

man, and plaintiff then told her husband to "go ahead." She testified that "thereupon it was agreed that Mr. and Mrs. Guetebier and Mr. and Mrs. Miller were each to have a one-fourth interest in the A. C. Miller Grocery Company and it was agreed between Guetebier, plaintiff and defendant Miller, that Mr. and Mrs. Miller, were to put in $1,250 and Guetebier and his wife were to put in $1,250." Mrs. Guetebier died in 1918, and from 1912 to the date of her death, she worked for the A. C Miller Grocery Company. Plaintiff did not know whether Mrs. Guetebier drew a salary or not. Plaintiff's duties in the store were "answering the phone, taking orders, keeping the books, checking up the bills, writing the checks, sold goods and did part of the buying, collected bills and deposited the money in the bank." Mr. and Mrs. Guetebier and Mr. and Mrs. Miller, at all times, had access to the cash drawer. Mr. Wilder, plaintiff's friend and adviser, suggested to Miller an incorporation of the business when Guetebier came into the store, and, if it was deemed advisable not to incur the expense of incorporating, that the partnership agreement should be put in writing, which Miller refused.

"Q. Well, was there then subsequently an agreement as to who would become interested in the new store out there? A. Yes, sir.

"Q. Well, now, tell us what that was? A. That was Mr. and Mrs. Guetebier and Mr. and Mrs. Miller.

"Q. What interest were you four people to each have in that store? A. One-fourth.

"Q. One-fourth? A. Half and half with brother and brother-in-law, and fifty-fifty with the wives."

No written contract of partnership was ever made. Plaintiff had suggested putting the agreement in writing and had tried very hard to get the business incorporated both with Mr. Miller and Mr. Guetebier.

"Q. What did you say to them about incorporating? A. Just wanted to incorporate to keep things straight, see where we all belonged."

Plaintiff contributed $1,000 and Knestead contributed $1,000 to the partnership of Knestead & Miller. Mr. Miller did not put a dollar into that partnership. Plaintiff was injured in an automobile accident in July, 1921, and was not able to remain in the store and work all the time, but worked part of the time, returning to work in August and worked until October, at which time she was assaulted by Miller's sister, and she had been in ill health since that time. Miller then shut up the cash drawer and locked plaintiff out, taking the keys of the store away from her. Miller caused his wife to be sent to an insane asylum in the summer of 1922 and, upon her release, she filed a suit for maintenance in the Circuit Court of the City of St. Louis against respondent, which suit was pending at the time of the trial of this action, and she had been awarded temporary maintenance of $18 per week and the use and occupancy of the family home. Miller, meanwhile, had filed a suit for divorce against his wife, which suit was also pending.

On cross-examination, plaintiff testified that she knew all about the buying of the store and property at the time it was bought.

"Q. Did you claim at that time that you was a partner? A. I was a partner.

"Q. Did you claim at that time you was a partner? A. Why, certainly.

"Q. Did you ask them to insert your name in the purchase of this property? A. How could I when I didn't see it?"

She *supposed* that Mr. and Mrs. Guetebier were interested 50-50 in the enterprise.

"Q. And that is the supposition that you have got in your mind, isn't it, simply because you are his wife, Mr. Miller's wife, you are a partner? A. Absolutely not; because the money was mine—when I worked—married Mr. Miller, it was my savings put in the St. Louis Union Trust Company and then Mr. Miller taken it and we went into partners together."

The Millers were married in 1903 and both worked after the marriage. Their earnings were not thrown into a general fund, but the money Miller earned was spent to pay household, clothing and table expenses, and Mrs. Miller's earnings of $45 a month went into the savings account and was accumulated for the purpose of going into business.

"Q. Isn't it a fact, Mrs. Miller, that during the time you and your husband lived together there, and you say you both worked, didn't you throw your money into the fund, and he earned money and he threw it into the fund, and you took it down and put it into the savings account? That is true, isn't it? A. Why, certainly.

"Q. Certainly; that is what I thought. So of this bank account which you got here, which you testified was under your name, was part Miller's money and part your money, wasn't it? A. No, it was not.

"Q. Why, you just said a moment ago it was; now what do you mean? A. Well, we didn't keep any books as to what he paid out.

"Q. You were saving money to get ready to go into business, your husband to go into business, wasn't you? A. Yes, sir.

"Q. And he threw in his savings, all that he could, and you threw in what you made, and it was a joint fund, and you took it down to the savings bank and put it in your name, isn't that true? A. I took his to pay the expenses, and I tried to hold on to the $45 to keep it in there.

"Q. You deposited more than $45 some months? A. Why, certainly I did, because, as I told you, I worked eighteen hours a day.

"Q. (By THE COURT): After this alleged partnership? Well, the testimony is he drew ten, and the other man drew ten. Both drew ten dollars a week.

"Q. Mr. Guetebier drew ten dollars a week? A. Yes.

"Q. What did you draw? A. I didn't draw anything.

"Q.   Why, if you was a partner at that time, didn't you draw yours?   A.   Well, they quit that in about three or four months.

"Q.   What is that?   A.   They quit keeping account, and took whatever they pleased about a couple of months afterwards.

"Q.   They drew a regular stated salary, didn't they?   A.   No, they did not.

"Q.   Mr. Miller, after a while, drew twenty dollars a week, and Mr. Guetebier drew twenty dollars a week?   A.   I got a little book there to show you when he stopped, and everything.

"Q.   Didn't you know that to be a fact, Mr. Guetebier after the business became prosperous, drew twenty dollars a week instead of ten?   A.   Yes, I know the time he drew forty-five, too.

"Q.   Yes; and Mr. Miller drew twenty dollars a week?   A.   I don't know; I couldn't keep track of it.

"Q.   You kept the books?

"THE COURT:   Let me say something right here. There is certain proof got to be made so far as the partnership is concerned.   If this was a wifely interest, and not that of a partnership, and it appears so, the fundamental principles of a partnership have not been established anywhere in this case."

The cause was submitted to the trial court upon the foregoing testimony, and thereupon judgment was entered in favor of defendants, with a finding that plaintiff is not entitled to the relief prayed for in her petition, the application for appointment of a receiver was denied and plaintiff's bill dismissed.   Motion for new trial was duly filed and overruled, from which order plaintiff appeals.   On March 28, 1924, appellant was adjudged to be a person of unsound mind in the Probate Court of the City of St. Louis, and Otto A. Hampe was appointed and qualified as the guardian of her person and estate, and, as such guardian, prosecutes her appeal here.

Only one question is raised by appellant on this appeal, namely, whether the facts disclosed by appellant's

testimony show that a partnership had been created. If this question be answered affirmatively, then the court *nisi* erred in dismissing appellant's bill; if answered negatively, the judgment *nisi* must be affirmed.

The action is one in equity; hence this court may, and should, review the evidence as though the case were here *de novo*. We have, therefore, undertaken, at the expense of brevity, to state somewhat in detail the substance of appellant's testimony below. It stands admitted on the record that there was no written partnership agreement. But even where there is a written agreement, it is often difficult to determine, as a matter of law, whether a partnership was created. The mere fact that parties call themselves partners in a written agreement, does not necessarily determine the question of partnership.

In McDonald v. Matney, 82 Mo. 1. c. 365, we said: "It would be difficult to state any one fact or stipulation which would be decisive of the question except a stipulation expressed that they were partners *inter sese,* and even this might be controlled by other stipulations, and the conduct of the parties in relation to the business. Each case must be determined upon its own peculiar facts."

Again, in Thompson v. Holden, 117 Mo. 118, it was held that the fact that land is referred to, in a written agreement between the parties, as "partnership land," is not conclusive on the question of its partnership character. Likewise, the mere participation by one in the profits or losses of a business, does not *per se* constitute him a partner therein (Thompson v. Holden, supra; Graf Distilling Co. v. Wilson, 172 Mo. App. 612; Nugent v. Armour Packing Co., 208 Mo. 480; Kellogg Newspaper Co. v. Farrell, 88 Mo. 594), but whether the relation of partnership exists depends upon the intention of the parties.

In 30 Cyc. 412, 413, it is said: "When the party alleging the partnership claims to have been a partner, he is in a position to establish its existence by direct evi-

dence, and is generally required to furnish such proof, while a third person is not under such a duty. . . . In the absence of a written agreement, a person who alleges a partnership between himself and another is bound to establish its existence by clear proof.''

In Graf Distilling Co. v. Wilson, 172 Mo. App. l. c. 619, the St. Louis Court of Appeals said: ''And the evidence was not such as to justify the court in declaring as a matter of law that a partnership existed. So far as going to show that defendant was a partner in the business, it merely showed that the original agreement between the parties was that he was to share in the profits, if there were profits, in return for having indorsed Goldbaum's notes, after the latter had been paid. So far as the evidence shows, there was no agreement that defendant and Sackman were to bear any portion of the losses; and the mere participation in profits and losses, alone, would not necessarily make them partners in the business. Whether in fact a partnership existed between the parties or not depended upon their intention, to be discovered from the contract into which they had entered, and construed in the light of all the facts and circumstances of the case.''

In Wittling v. Schreiber, 202 S. W. 418, the same court said: ''A mere statement that a certain business was a partnership business or that the parties were partners, is a mere legal conclusion and is of no probative force in establishing the fact of partnership. Even evidence that one person was to pay half the expenses and receive half the profits, was not evidence of facts necessary to be shown to establish the existence of a partnership. Such relation springs only from an agreement between parties evidencing an intention to enter into it and if the testimony is oral, that oral testimony should show facts which would constitute and establish the substance at least sufficiently to arrive at the conclusion that there was a partnership.''

In Chapin v. Cherry, 243 Mo. 375, a case where two parties plaintiff sought to establish a partnership own-

ership of a tract of land purchased by and in the name of defendant; this court discussed the elements of proof necessary to show the existence of a partnership, in this wise: ''The primary question, therefore, presented for determination is, did a partnership relation exist between them at the time the land was purchased by the appellant? If so, it must be because a partnership agreement between them must have been entered into prior to the date of said purchase. That is self-evident, and before there could have been such a contract, the minds of all the parties thereto must have agreed to the same thing, in the same sense and at the same time. This mutual assent of the parties must embrace all the propositions of the parties, and so long as any matter forming an element of the contract is left open, the contract is not complete, and therefore not binding upon any of the parties. The foregoing statement of the law of partnership is announced by all of the authorities, here and elsewhere. [Green v. Cole, 103 Mo. 70; Sutter v. Raeder, 149 Mo. 297.] . . .

''From the earliest days in this State, this court has been wedded to the doctrine that general remarks occurring in a conversation between two or more parties regarding a business proposition, are not sufficient evidence of a partnership agreement. [Price v. Edwards, 11 Mo. 524.] The terms, conditions and elements of the proposed co-partnership must be unequivocally and unconditionally agreed to by *all the parties thereto,* without any variance between the propositions or conditions proposed by any one of them and the acceptance by the others. Or, as was held in the case of Mackie v. Mott, 146 Mo. 230, the foundation of a co-partnership is one of intention by *all the parties thereto,* which must be arrived at from the contract itself, and surrounding circumstances. . . . These are some of the reasons why the law permits every person to select his own partners and never presumes the existence of a co-partnership, but requires those who assert its existence, especially as

between themselves, to prove its existence by the clearest and most positive evidence."

Again, in the very recent case of Hely v. Hinerman, 303 Mo. 147, WOODSON, J., delivering the opinion of this court, said: "Counsel for appellant first insists that the circuit court erred in refusing to permit in evidence the statements of Hinerman and Cope to the effect that defendant Smith was a partner in the co-partnership of Hinerman Construction Company. There is no merit in this contention. Clearly all such statements are merely statements of legal conclusions. A co-partnership can be created only by contract made and entered into by the parties, and in order to prove its existence the terms of the agreement must be proven, and the fact of its existence must be drawn from the terms proven, and not the terms of the contract from the mere statement of the fact, or legal conclusions. [Graf Distilling Co. v. Wilson, 172 Mo. App. 612; Wittling v. Schreiber, 202 S. W. 418; Brandon v. Distilling Co., 52 So. (Ala.) 641.] . . . Nor was there error in the refusal of the court to permit witnesses to testify that Hinerman and Cope stated to them Smith was a partner or had agreed to go into the partnership. They were purely legal conclusions and did not pretend to state the agreement which constituted the co-partnership. The authorities sustaining this proposition are numerous. [Citing cases.]"

Adverting now to appellant's testimony, it is quite clear to us that it does not measure up to the standards of proof required to establish the existence of a partnership, as laid down by the courts of this State in the foregoing cases. At most, her statements relative to the alleged agreements of the parties are mere statements of legal conclusions and not statements of ultimate facts tending to show the creation or existence of a partnership. She was repeatedly asked by the chancellor *nisi* to relate or state what was said by each of the parties, but at no place in her testimony do we find any conversations between the parties related by the appellant from which the terms and conditions of a partnership con-

tract may be fixed or determined. Again, while appellant states that she was to share in the profits of the venture, yet the record is devoid of any agreement upon her part to share the losses, if any there should be. Upon her own testimony, it is evident that she received no profits from the business. The profits, so she testified, were used to purchase the real estate, title to which was taken and held by A. C. Miller and William Guetebier, and to pay off the indebtedness of $11,000 secured by deed of trust thereon. Perhaps the strongest evidence in appellant's behalf may be said to be that she joined with Mrs. Guetebier in the execution of the promissory notes, as well as the deed of trust, representing the indebtedness incurred in the erection of the store building. But the record is silent as to the reason why she signed the notes. It might well be said that the lender, at the time the money was loaned, required the wives of Miller and Guetebier to sign the notes as additional security for the loan. Nor is the fact that appellant worked in the store sufficient, in and of itself, to prove the existence of a partnership, for she testified that she was "to help him work and *keep from paying salary.*" It may be that appellant, out of her personal savings, accumulated before and since her marriage, had loaned or advanced to her husband the money with which he engaged in business, but there is no evidence that either Mr. or Mrs. Guetebier knew that fact or that they agreed with Miller and his wife to form a partnership. The appellant did not see fit to call the respondents, or either of them, to testify respecting the agreement, if any there was, between them. We find that the testimony in this case falls far short of establishing a partnership by clear and positive evidence. If appellant is entitled to recover from her husband the money she claims to have advanced him out of her personal savings, then her remedy is not in this action. Before being entitled to an accounting and the appointment of a receiver to wind up the grocery business, under the allegations of her petition in this action, she must prove the creation and existence of a partner-

ship, and this she has failed to do. It follows, therefore, that the trial court committed no error in denying her application for the appointment of a receiver and in dismissing her bill, and the judgment below is accordingly affirmed. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of Court in Banc. All of the judges concur, except *White, J.,* who dissents, and *Otto, J.,* not sitting.