LORENE BROOKS, Appellant, v. VERNON C. BROOKS.—No. 40431.—208 S. W. (2d) 279.

Division Two, January 12, 1948.

Rehearing Denied, February 9, 1948.

*J. Grant Frye* and *Gerald B. Rowan* for appellant.

*J. V. Conran, L. D. Joslyn* and *Haw & Haw* for respondent.

[280] BOHLING, C.—This is an action by Lorene Brooks, the wife, against Vernon C. Brooks, the husband (hereinafter designated by their christian names), in which she seeks an accounting of the proceeds of an alleged joint adventure between them, a receiver, and general equitable relief. She charged that some of the proceeds of the joint adventure were applied to the purchase of certain described real estate and prayed that she be decreed a joint owner of the same, and, as we read the record, it indicates the amount in dispute exceeds $15,000. A trial resulted in the dismissal of plaintiff's bill. She appealed to the Springfield court of appeals and that court transferred the review proceedings here on the ground title to real estate was involved.

Lorene and Vernon were married October 24, 1937, she being 19 and he 36 years of age. She had been clerking at a confectionery. He was a deputy sheriff and township constable at Charleston, Mississippi county, Missouri. He had property worth perhaps $200 to $400. They were unable to live on what he made as constable after he quit as deputy sheriff.

Vernon's father, E. R. Brooks, owned a liquor store and they would help him. It was near a grocery, meat, and package liquor store operated by Fred Long. About September, 1938, Vernon learned that Long would sell. Lorene testified he asked her how she would like to go into business "down in negro town." She knew E. R. Brooks had to live with his business and at first was undecided because it was not the proper place for white people to live. E. R. Brooks testified it was an undesirable place for a white woman. Long was willing to sell at a little above "inventory" price and they estimated $1500 would purchase his business. Lorene testified they discussed the matter and Vernon said he would buy .the liquor license in his

name and they would go down into negro town and work together until they got started and then move out; that the business would be "ours" and later they would put their money in a joint account; it would be "mine and his business and we would work together." They discussed how they might raise the money. At her suggestion, they decided to see Roy Buckner of the Moon Distributing Company, at Cape Girardeau, Missouri.

Vernon testified that nothing was said between him and his wife about joint names, joint account, sharing in halves, or about Buckner. He said his father advised him to buy Long's business "or he would buy it if I wanted it"; that he may have said something to Lorene about it but did not consult her, and never had any conversation with Buckner about Lorene and he buying the store. He admitted his wife and he had an "understanding they would live and work in the negro district until they made some money and then would move out."

Lorene testified she and Vernon went to see Buckner at Cape Girardeau without delay and in a few days he told them they could have the $1500; that Vernon told Buckner he was not borrowing the money himself but that both of them were buying the store and both of them were borrowing the money. Vernon testified he and his father went to see Buckner at Cape Girardeau; that Lorene did not accompany them; and that Buckner, at that time told them to take the inventory, let him know the amount of money and he would bring it down. E. R. Brooks testified Buckner had promised to let him have the money if he bought Long's place; that he had another person find out that Long would sell and this person tried to get the money from Buckner but Buckner came to him, witness, and Vernon bought it; and that Lorene did not make the trip with them to see Buckner about borrowing the money.

Buckner testified as follows: The Moon Distributing Company, through him, sold E. R. Brooks merchandise. He met Lorene and Vernon at E. R. Brooks' store and about a month later they told him in the presence of E. R. Brooks that they could buy the Long store. The next day they came to Cape Girardeau to see about borrowing the money. He was certain Lorene and Vernon were there and was of opinion but was not sure that E. R. Brooks was with them. In a day or two he told Vernon and Lorene he would let them have the the $1500. He testified that he was making the loan to both of them; [281] that Lorene and Vernon were buying the store; that both of them were going to work, operate the store, and pay back the money. Buckner's conviction for transporting "hootch, moonshine, corn whiskey" was shown.

The inventory took four days and they soon realized $1500 would not purchase the property. The final price was $2882. $1500 of this was represented by a Buckner check. Buckner was at the Long

store when the inventory was being finished. He testified E. R. Brooks owed him for merchandise; that he collected $500 from him and turned it over to Vernon and Lorene. Vernon testified he received the additional $500 cash from Buckner and $882 from E. R. Brooks, which amount Buckner helped count out from a cigar box in the father's store, but he did not know where Buckner got the $500. E. R. Brooks testified he counted the $800 out of a box he had in his store and gave it to Buckner and Vernon to make the purchase; but denied he paid Buckner $500 cash at the time. Buckner denied that $800 in addition to the $500 was counted out by Brooks in his presence; and testified some money had been accumulated through the sale of merchandise while taking inventory and Vernon told him the $882 was taken out of the cash register, coming from the sale of merchandise. Long, the vendor, testified he received the $1500 check; that Buckner lent Lorene and Vernon $500 additional and, as we read his testimony, cash taken in from sales during inventory was applied to take care of the balance of the purchase price.

The papers completing the transaction were drawn up in Tom Pruitt's office. Vernon, Buckner, Mr. and Mrs. Long were there. The evidence is contradictory whether Lorene or E. R. Brooks was there. Pruitt, at Vernon's instance, prepared the $1500 note and deed of trust covering money advanced by Buckner. He did not recall preparing a bill of sale. Lorene testified Mr. and Mrs. Long executed a bill of sale covering the store to "Vernon and Lorene Brooks"; that Vernon had it the last she knew of it. Long testified he executed a bill of sale in duplicate to Lorene Brooks and Vernon Brooks. He destroyed his copy approximately two years before the trial. Vernon testified he never received a bill of sale from the Longs, but that Long gave him a statement he would not engage in the business for two years.

The $1500 note and deed of trust securing it are dated October 1, 1938. In addition to the signatures of Vernon and Lorene, the note carried the signature of E. R. Brooks, thus: "Eliga Brooks." E. R. Brooks testified he signed the note when the $1500 was paid over but he could not remember where that occurred. Lorene testified E. R. Brooks' name was not on the note when she signed it; that she had no information that he was going to sign it, and that she did not know he had signed it. Buckner testified the $1500 note was signed in Long's store. He refused to identify E. R. Brooks' signature on the note, stating he did not know whose signature it was or that "Eliga" was E. R. Brooks; that he was satisfied with Vernon's and Lorene's signatures on the note and he did not care for other signers; that he did not know E. R. Brooks signed it and thought he was not on it.

Lorene testified they decided to take out the license for the hard liquor package business in Vernon's name and then if anything happened they could carry it in her name. Later a beer tavern next

door wa., purchased. Vernon testified the hard liquor license was taken out in his name and the beer license in the name of Guy Glover, an employee, and later taken in Lorene's name, Glover having quit, and in his name after he and Lorene separated in September, 1943.

Lorene testified that she went into the store about October 1, 1938, the first day they started taking inventory, and worked faithfully therein until it was sold in April, 1943; that she would attend to ordering from wholesale houses, pay bills, and pay the help; that they discussed who to hire, the wages, and letting help go; that she saw about painting, new screens, replacing broken window panes; that she also took care of her housework, sewing, preparing meals et cetera. They usually closed up between 9 :30 and 10 P. M., but during the cotton season (Fall) they kept open until 11 or 11 :30 P. M. Their home [282] was about three feet south of the store, and whenever she was wanted, if she were not in the store, they would step out the door and whistle for her to help out. She testified that Vernon was away sometimes on account of sickness, at other times on trips, including airplane trips, and that he went fishing and hunting frequently; that the beer tavern was not a decent place in which to work (which statement was corrobated by others) and she did not work in it. Vernon and a negro worked at the beer tavern and when Vernon was absent on fishing and hunting trips, she would order the beer for the tavern and go down at night to check out the money.

Vernon testified that Lorene worked in the liquor store "pretty good" for a year but after he bought the home outside of negro town about February 17, 1942, she did not work steadily. He testified he ate his meals at restaurants by himself. Lorene said Vernon ate at restaurants occasionally. E. R. Brooks testified that Lorene worked "pretty good" for the first year, but after that she "dropped back."

Vernon appears to have had active charge of the business when in attendance, managing, buying, paying accounts, hiring and firing; but there was also testimony that Lorene assisted in this and attended to it when he was away. The business and bank accounts stood, we understand, in the name of Vernon Brooks Liquor Store. Lorene and Vernon each took money out of the cash register at will. Neither worked on a salary basis. He purchased some Government bonds, taking $1250 in their joint names and $300 in his name. One piece of real estate was taken in their joint names, but other real estate, including the home, stands in his name. Lorene's testimony is to the effect the understanding was that the property, real and personal, they acquired would be in their joint names; that Vernon attended to the transactions and she took his word for it that it was in their joint names. The store was sold in April, 1943, for $7,500. On September 8, 1943, the date before the separation, he withdrew $6,000 from the bank account, according to his testimony, to pay some creditors and mentioned he owed Felix Summers and Fred Blakley some money

borrowed between $200 and $300, and $500 and $600, respectively. He could name no other creditors and stated he had lost the receipts. Lorene's testimony was to the effect the store did not owe the money.

The $1500 note, with interest, was paid by a check of E. R. Brooks for $1,740, dated December 7, 1940. Lorene's testimony was to the effect that about two years after they purchased the store Vernon took money from the cash box at the store and stated they had the money and he was going to pay Buckner; that, if Vernon's father paid the note, they did not tell her; that at the time the note was paid she and Vernon had lent money to others and they were not in need of money. Vernon testified that neither he nor Lorene ever paid any part of the $1500 note. This record establishes that Vernon purchased an airplane after they acquired the store property and he took frequent trips in it, one to Miami, Florida, for two weeks; that he would go hunting two or three times a week in the Fall and sometimes during the dove season he would take off every afternoon for a couple of hours, and occasionally he would go fishing a couple of days a week. There was testimony that on Saturdays during the cotton picking season they might gross $1000 at the store and that during the five years of operating the store they accumulated more than $15,000 in assets. E. R. Brooks knew Vernon was spending a lot of money hunting and fishing.

E. R. Brooks never took any evidence of debt from Vernon covering the $882 they claimed to have been advanced by him to purchase the store or the $1,740 advanced to pay off the Buckner $1500 note.

There are other facts in evidence, such as Lorene leaving Vernon for about a week a few years prior to the final separation, as well as facts bearing on the credibility of the witnesses, but we need not set them out as they would not change the result with respect to an agreement for a joint venture between Lorene and Vernon.

Lorene's testimony as to conversations with Vernon out of the presence of third parties establishing the joint adventure was admitted subject to objection and later, when ruling the case, the court held [283] these conversations were inadmissible and were not to be considered in determining the facts on the ground they were confidential communications between husband and wife. Broad assertions to that effect may be found in the cases, some being unreasoned and unnecessary to a decision. Grott v. Grott (Mo.), 249 S. W. 55, 57[5]. The exclusion of confidential communications in divorce and other cases involving the marital relationship are not this case. Kistner v. Kistner (Mo. App.), 89 S. W. 2d 106, 111[1, 2]. The broad language in the early case of Berlin v. Berlin (1873), 52 Mo. 151, 152: "The witness was clearly incompetent as to any conversations had with defendant, or as to any admissions made to her by him," was soon modified by the same author (Sherwood, J.) in Darrier v. Darrier (1874), 58 Mo. 222, 234, involving property rights wherein a letter

from the husband directing his wife to purchase land for him and limiting her authority was held admissible in the husband's suit to divest the wife of title and vest it in himself, she having wrongfully taken the title in her name.

The conversations here involved relate primarily to business matters, not marital confidences, and are clearly a part of the res gestae. The better reasoned cases are to the effect that in actions between a husband and wife involving property rights the rule excluding relevant conversations between them in the absence of third persons as confidential communications yields to the necessity of the situation for the prevention of injustice and they are competent witnesses respecting such conversations. This harmonizes with our present public policy of constituting a married woman a femme sole for the purpose of transacting business, contracting, suing, being sued et cetera (Sec. 3385, R. S. 1939), and recognizing her rights in her separate property, real and personal, including earnings (Sec. 3390, Id.) Hach v. Rollins, 158 Mo. 182, 190, 59 S. W. 232, 234, was a widow's bill to set aside the deceased husband's conveyance, made on the eve of their marriage, in fraud of her dower and homestead rights. The court considered the testimony should be excluded on account of the death of the husband, but stated on the instant issue that 'the common law recognized certain exceptions to the disqualification of a spouse, which were allowed in such instances from the extreme necessity of the case and: ''This doctrine of necessity prevails in Missouri, and the rule is established that a husband or wife is a competent witness, ex necessitate, as to conversations between them in order to expose a fraud that was perpetrated by the husband on the wife.'' If competent to expose it is competent to prevent a fraud. See also Henry v. Sneed, 99 Mo. 407, 420(I), 12 S. W. 663, 665(1); Moeckel v. Heim, 134 Mo. 576, 580, 36 S. W. 226; Rice v. Waddill, 168 Mo. 99, 121, 67 S. W. 605, 610; Wigmore on Evidence, 3d Ed., Vol. 3, Chs. 83, 79, Vol. 2, Ch. 25.

Sufficient for the purposes of the instant case, the authorities hold a husband may by an express agreement with the wife relinquish his common law rights to her earnings. Ex parte Badger, 286 Mo. 139, 143(I), 226 S. W. 936, 937(I); Dunifer v. Jecko, 87 Mo. 282; Warren v. Davis (Mo. App.), 97 S. W. 2d 159, 162[1]; Annotation, L. R. A. 1917E, 282; 41 C. J. S. p. 413, secs. 17, 130, 258; 27 Am. Jur. 66, sec. 468. Defendant's cases recognize the rights of the wife where there is an understanding with the husband that she is to have the fruits of her labor. Plummer v. Trost, 81 Mo. 425, 428; Hendricks v. St. Louis Transit Co., 124 Mo. App. 157, 101 S. W. 675.

Plaintiff's cause of action proceeded upon the theory of an express agreement between the husband and wife for the conduct of a joint adventure. ''A joint adventure has been aptly defined as a

special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation, or as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge.'' 48 C. J. S. 801, sec. 1; Neville v. D'Oench, 327 Mo. 34, 59, 34 S. W. 2d 491, 503[1, 2]; Denny v. Guyton, 327 Mo. 1030, 1053 et seq., 40 S. W. 2d 562, 570[6-14]; State ex rel. McCrory v. [284] Bland, 355 Mo. 706, 197 S. W. 2d 669, 672[3-5]. Among the observations quoted with approval from Corpus Juris by court en banc in Denny v. Guyton, supra, are:

''. . . 'Whether the parties to a particular contract have there-by created, as between themselves, the relation of joint adventurers, . . . depends upon their actual intention, which is to be determined in accordance with the ordinary rules governing the interpretation and construction of contracts.' . . . 'Any person legally competent to contract may become a party to a joint adventure.' . . . 'In the absence of statutory provisions to the contrary the contract may be oral or written. . . . The agreement is not rendered invalid by any uncertainty in the duration of the business or indefiniteness in the minor details of the adventure. . . . The mutual promises of the parties to a joint adventure are a sufficient consideration to support their contract.' . . . 'Within the scope of the enterprise they stand in a fiduciary relation each to the other, and are bound by the same standards of good conduct and square dealing as are required between partners.' ''

''. . . But it may be said of the great majority of such agreements that they do not point out precisely what each party is to do under them. . . . And the contract is not avoided for indefiniteness because the minor details are not fully established. . . . Decisions defining and describing partnerships are not controlling upon the question of whether the parties to the agreement were joint adventures.'' See also 48 C. J. S. Joint Adventures secs. 2, b; 3; 5, b.

''A preponderance of the evidence is necessary and sufficient to prove a joint adventure.'' 48 C. J. S. 858, n 61. This is in accord with the approved quotations from Corpus Juris by the court en banc in Denny v. Guyton, supra. The phase of the case now under discussion does not involve the specific performance of an oral contract for the conveyance of real estate (Feigenspan v. Pence, 350 Mo. 821, 826[1], 168 S. W. 2d 1074, 1078[6]) or the establishment of a resulting trust in real property (Dixon v. Dixon (Mo.), 181 S. W. 84, 85[I]; Medlin v. Morris, 243 Mo. 260, 278, 148 S. W. 85, 90[3]); and the husband's contention that to make a case the wife's evidence must meet the high standard of proof required in that character of litigation is not in conformity with the law and is disallowed. On that feature of the case the instant record discloses Vernon testified to

the effect that the moneys he made had their origin in the proceeds of the store.

Our present concern is limited to the establishment of a joint adventure and in this we think the preponderance of the evidence is with the wife. The testimony of the noninterested witnesses and the extrinisic facts sustain Lorene's version rather than Vernon's. Vernon at the time of the purchase had nothing to pay down on the property. Long, the vendor, testified he executed a bill of sale for the property to Lorene and Vernon. Buckner, the man who made the purchase money available, understood that Lorene and Vernon were buying the store; that both were going to work in it and repay the loan. He did not require Lorene's signature on the note in addition to the deed of trust as a mere additional security as was the case in Miller v. Miller, 311 Mo. 110, 127, 277 S. W. 922, 927; but he took both the husband and the wife for the transaction and the debt as principals, and his testimony indicates he approved the purchase and lent the money as much on the strength of Lorene's participation and credit as on Vernon's. There is testimony that Lorene worked in the store and managed and operated it, ordering merchandise, paying accounts, and having licenses in her name, and exercising authority over the employees. Vernon may have performed the bulk of the managerial functions but she exercised authority also and it was but natural that she defer to his activities and judgment. She also attended to her household duties next door to the store. She could not be expected to be in attendance at the store every hour of the day. We cannot agree with Vernon's contention, if it be sufficient to defeat this action, that Lorene did not perform. His own testimony disproves it in part. The understanding was that when they were able they would purchase property outside of negro [285] town and she would not have to continue to live there. The evidence establishes that Vernon was frequently absent from the store. During these periods some one had charge of the business and the greater weight of the evidence shows that Lorene supervised it. Witnesses offered by Vernon testified to that effect although they sought to belittle her activities. Vernon's father testified that Vernon had not worked since the separation; and that he, witness, then approximately 67 years old, had operated the beer tavern and later sold it.

The judgment dismissing plaintiff's petition is reversed and the cause is remanded with directions to cast up the accounts between the parties and take further proceedings as are proper in the adjustment of their rights arising out of the joint adventure. *Westhues* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.

## ON MOTION FOR REHEARING.

PER CURIAM:—Defendant, in his motion for rehearing, claims we completely failed to give deference to the findings of the Chancellor. The Chancellor excluded from consideration competent evidence of record respecting the res and vital to plaintiff's case. It is our duty to consider all competent evidence, including that excluded by a chancellor, and to render such judgment as should have been rendered. A chancellor's findings lose weight when he excludes competent evidence.

The motion directs attention to the testimony of plaintiff in one place of record that E. R. Brooks signed the $1,500 note. This was inadvertently omitted in connection with our statement of plaintiff's testimony that his signature did not appear on the note originally. The motion also questions the statement respecting our understanding of the business and bank account being in the name of Vernon Brooks Liquor Store. A rereading of the record discloses specific references that the business was so known although the bank account may have been in Vernon Brooks' name. There are discrepancies in plaintiff's testimony, but material portions are supported by other witnesses. Also, there are discrepancies in defendant's testimony. The facts mentioned are insufficient to change the result.

Other issues in the motion are covered in the opinion.

The motion for rehearing is overruled.