William T. RAY, Plaintiff-Respondent,

v.

Gloria Mae RAY, Defendant-Appellant.

No. 7835.

Springfield Court of Appeals.

Missouri.

June 22, 1960.

---◆---

G. C. Beckham, Steeleville, J. Ben Searcy, Eminence, for defendant-appellant.

Granville L. Gamblin, Clayton, William E. Seay, Salem, for plaintiff-respondent.

RUARK, Judge.

This case involves an accounting between husband and wife. Plaintiff husband, now respondent, sued his wife for divorce. Defendant wife filed a counterclaim wherein she alleged that plaintiff had taken and converted certain property and money which were jointly owned. Her prayer was for an accounting. On trial of the case the court granted decree of divorce to plaintiff, ordered custody of the only child of the marriage (a sixteen-year-old son) in the maternal grandmother, and gave judgment on defendant's counterclaim in accounting in favor of plaintiff. The wife has appealed from the judgment on her counterclaim. The propriety of the judgment for divorce is not in question.

At the outset we are presented with the question whether, certain personalty having been acquired by purchase with money drawn from a joint account of husband and wife, the action was premature. The contention is based upon the premise that, in the absence of evidence of any intention to the contrary, the property is to be presumed to be held by the entirety (Cullum v. Rice, 236 Mo.App. 1113, 162 S.W.2d 342; Glynn v. Glynn, Mo.App., 291 S.W.2d 190, 197; Hanebrink v. Tower Grove Bank & Trust Co., Mo.App., 321 S.W.2d 524; Feltz v. Pavlik, Mo.App., 257 S.W.2d 214; State Bank of Poplar Bluff v. Coleman, 241 Mo. App. 600, 240 S.W.2d 188; see 26 Am.Jur., Husband and wife, sec. 81, p. 712); and that, since the common law incidents remain,[1] the action for accounting based on conversion of entirety property by one spouse as against the other creates friction with the fiction that each owns all. That is, one cannot be charged with converting his own property. In Smith v. Smith, 300 S.W.2d 275, we attempted to trace the development of the wife's right to sue her husband for conversion of her separate property but expressed some doubt as to whether she could sue, while still married, for conversion of entirety property. Now we are squarely confronted with the question, and so far as we have been shown or are able to find this is the first time it has ever been clearly presented to or decided by an appellate court in this state.[2]

It has been held that property owned by entirety cannot be partitioned without consent of both spouses. Otto F. Stifel's Union Brewing Co. v. Saxy, 273 Mo. 159, 201 S.W. 67, L.R.A.1918C 1009.[3] But in Rezabek v. Rezabek, 196 Mo.App. 673, 192

1. Craig v. Bradley, 153 Mo.App. 586, 134 S.W. 1081; Schwind v. O'Halloran, 346 Mo. 486, 142 S.W.2d 55; Stewart v. Shelton, 356 Mo. 258, 201 S.W.2d 395; Ashbaugh v. Ashbaugh, 273 Mo. 353, 201 S.W. 72; Holmes v. Kansas City, 209 Mo. 513, 108 S.W. 9; Otto F. Stifel's Union Brewing Co. v. Saxy, 273 Mo. 159, 201 S.W. 67; McElroy v. Lynch, Mo., 232 S.W.2d 507.

2. The conflict of authority generally is demonstrated at 41 C.J.S. Husband and wife § 34d(1) (a), p. 464, et seq.; Annotation 168 A.L.R. 260. For modern treatment of this subject see Wallaesa v. Wallaesa, 174 Pa.Super. 192, 100 A.2d 149; Brobst v. Brobst, 384 Pa. 530, 121 A.2d 178; Kaufmann v. Kaufmann, 166 Pa.Super. 6, 70 A.2d 481; De Luca v. De Luca, 388 Pa. 167, 130 A.2d 179; Lacker v. Zuern, Fla.App., 109 So.2d 180; Smith v. Smith, 211 Md. 366, 127 A.2d 374; Fitzpatrick v. Fitzpatrick, 181 Pa.Super. 581, 124 A.2d 709; Lohmann v. Lohmann, 50 N.J.Super. 37, 141 A. 2d 84.

3. But see Hopkins v. Hopkins, Mo.App., 260 S.W.2d 833.

S.W. 107, it was held that one spouse might have an accounting for the *rents and profits* from a leasehold held by the entirety; and in Prasse v. Prasse, Mo., 77 S.W.2d 1001, 1006, the husband was permitted to recover one-half the amounts taken from the joint account and used to improve the wife's property. In at least one case (Brooks v. Brooks, 357 Mo. 343, 208 S.W.2d 279, 4 A.L.R.2d 826), similar in some respects to the instant case, the court was able to allow an accounting by treating the husband and wife as joint adventurers.

Since we have held (Smith v. Smith, supra, 300 S.W.2d 275) that the wife may now maintain any character of action for the protection or recovery of her separate property, it would seem impractical to say that she must await divorce and then bring another action for the protection of the interest which is hers in an entirety property.[4] As to the objection based on public policy, it would appear that if the husband and wife are warring for the possession and use of entirety property the marriage schooner is already pretty well on the rocks. And theoretically we think the fiction of complete indivisible interests can be met on the hypothesis of agreement and acquiescence. Certainly a husband and wife can, by agreement, change the character and attributes of the estate (Stewart v. Shelton, 356 Mo. 258, 201 S.W.2d 395; Shackleford v. Edwards, Mo., 278 S.W.2d 775) or permit its destruction by acquiescence and consent. Zahner v. Voelker, Mo.App., 11 S.W.2d 63. As a matter of fact, whenever a portion of an entirety account is withdrawn for the personal use of one of the parties by the consent of the other, there is a change in the character of the ownership as to that part so withdrawn. See Harrellson v. Barks, Mo.App., 326 S.W.2d 351, 361; Ambruster v. Ambruster, 326 Mo. 51, 31

S.W.2d 28, 37, 77 A.L.R. 782; Feltz v. Pavlik, Mo.App., 257 S.W.2d 214, 218, supra. Ownership of personal property, unlike that of realty, is often transferred by informal act. If one of the parties takes the personal property to the complete denial of the other, he thereby in effect asserts that he denies the existence of an entirety title and has "consented to or proposed" a destruction of the indivisible interest. In such a situation the spouse should have the option to accept and agree to such proposal of destruction and proceed to have her interest protected.[5] We think it now should be held that a spouse may maintain an action for accounting after a conversion of personal property owned by the entirety.

The facts in this case are complicated and confusing. The picture cannot be shown except by relating a generalized financial history of the parties.

Plaintiff and defendant were married in 1942 when he was twenty-three and she was seventeen. They separated in early December 1957. At the outset of the marital venture the parties had little in the way of material possessions, and the assets now in dispute were acquired in the fifteen years of their joint work and enterprise. Defendant was employed during the whole of this period, except for a brief time after the birth of the child of the marriage in the first year. We gather that she was perhaps more the "pusher" of the two, although there is little dispute that the efforts of both contributed to the accumulation of the assets in controversy.

In 1950 the parties were living in St. Louis, he employed by General Motors Corporation and she at the Army Finance Center. They had already set up a joint savings account. In that year they moved to Licking, Missouri, and lived in a house with defendant's parents, a one-half interest in which the parties had purchased

4. Since the courts created the theory of "oneness," they ought to be able to make an exception to it. Tendrich v. Tendrich, 90 U.S.App.D.C. 61, 193 F. 2d 368.

5. Rochon v. Rochon, Pa.Com.Pl., 38 Del. Co.R. 113; see Stewart v. Stewart, Pa. Com.Pl., 43 Del.Co.R. 238; and Krickich v. Krickich, Pa.Com.Pl., 18 Beaver 259.

as tenants by the entirety. Both secured jobs at Fort Leonard Wood. Defendant was a civil service employee, and her gross salary soon exceeded that of the plaintiff. They had some money in their joint account, and after a time they decided to inaugurate a bus service between Licking and Fort Wood for the transportation of persons employed at the fort. We are convinced, without belaboring this phase of the history with details, that the Public Service Commission permit was obtained through their joint efforts (she assembling the data, et cetera), although the permit was issued in the husband's name. The first buses were purchased either directly or indirectly from the bank account of the parties. Some of the purchase money came from loans from defendant's parents which were later repaid from the joint account. As the business prospered, additional buses were added from earnings and joint assets, and although there is dispute as to some, we believe that titles to the buses were taken in their joint names. All moneys received and disbursed went through the joint account. Both continued in their jobs at Fort Wood and both worked to make the bus line a success. He serviced the buses and (presumably) drove one of them. For about a year defendant drove one of the buses and thereafter relieved other drivers on occasions such as vacations. She kept the records, made reports, saw to the insurance, collected the (weekly) fares, assembled income tax information, and generally did what may be called the office work. To this point there seems little question that the parties were both busily engaged in holding down their jobs at Fort Wood as well as in operating the bus line by joint effort and for a joint and unified family purpose.

In December 1956 they had an opportunity to purchase a half interest in a garage business in Cuba, Missouri, and they moved to that city. The business was purchased for a total of $15,000, and it was necessary to put in $5,000 as working capital. The purchase was made with one Brown, who, as copartner, supplied one-half the required $20,000. The Chevrolet franchise and the lease on the property, however, were taken in plaintiff's name alone. The Ray $10,000 which went into the business came, in the words of plaintiff, "from what we had saved and we had it in St. Louis on interest and it was what we had saved." They drew $7,000 from a savings account. Plaintiff left his job at Fort Wood and drew his "retirement," which was deposited in the joint account. Plaintiff says this amounted to "about $500 or $600," but defendant says it was $400. Plaintiff had payroll savings bonds, which he cashed for $795.49 and (presumably) put into the joint account. They borrowed some money from plaintiff's uncle and subsequently repaid him from the joint account. When they quit the bus business they had two buses and a carry-all which they later sold (at different times) for something in excess of $4,500. In the early part of 1957 they bought new furniture which cost $2,000. At some point (we are not sure when) they borrowed $1,800 or $1,900 from defendant's mother. Since the moneys went into and out of the joint account, it is impossible to say just what funds supplied all of the purchase of the garage business and what was applied to the purchase of furniture, but there is no question that both were acquired with the joint funds, which came from the combined earnings of the parties. Plaintiff testified that he did not know how the bill of sale to the garage was taken, but defendant said she later learned it was taken in the names of her husband and Brown.

Through the first year of the garage business (December 1956–57), plaintiff worked in the garage and defendant retained her civil service job at Fort Wood. Her gross salary that year ($4,553.76, less withholding) went into the joint account and was used for family needs. During that year the garage made a net profit of $4,013.29. Although the net amount due the Ray account was a little in excess of $2,000, apparently only $1,050 of that sum

was actually withdrawn, and therefore approximately $1,000 remained to his credit at the end of the year.

To the point when the garage business went into operation, the parties seemed to be in full accord in their work and business affairs. Although the plaintiff is disposed to belittle the efforts of his wife concerning the garage, it is evident that she displayed considerable interest in that business operation. As she put it, her "fifteen years' work was invested there." Her salary furnished a large measure of support for the family while the business was getting under way that first year. The partner Brown was the sales manager, and defendant was frequently in the garage after her working hours with "leads" for car sales. In fact, it was her frequent after-hours presence at the garage which seems to have brought on this whole difficulty. Plaintiff complained that she spent too much time with Brown, and eventually the marriage collapsed in the lap of an attachment between defendant and Brown. However, the merits of the divorce are not in issue here.

By December 1957 the marital affairs were strained to the breaking point. It was then that Ray traded the family car for $1,500 and a used car which he (later) sold for $400. The $1,500 went into the joint account. Then in a few days (shortly before the separation) he withdrew the $1,500 and never replaced it. This left only $46 in the account. At the time of this occurrence plaintiff went on an overnight trip and said he lost the money gambling. At trial he said he used some of it to pay income tax and some to pay his lawyer. The wife's income tax had been withheld from her salary, and some amount (plaintiff said perhaps $300) had been paid in as estimated income tax on the garage business. Somewhere along about this time he also employed and paid a detective agency to shadow his wife.

After the separation the plaintiff stored, in his own name, the household furniture purchased earlier that year. Defendant testified that she asked him to store the furniture in both names but plaintiff asserted that "the furniture is not yours and I am going to see I get everything before I am through." She said that after the gambling trip episode he also declared his intention to "take everything here, even the clothes off your back if I can get them, and I certainly would like to try."

For some years life insurance policies totaling $39,000 had been carried on plaintiff's life, and premiums were paid from joint funds. After the separation plaintiff changed the beneficiaries in such manner that his wife would not possibly benefit from the policies. After the separation plaintiff also took from defendant's room a number of letters which had been written her by Brown and a watch which he said Brown had given her. No value is stated for the watch.

In casting up accounts against his wife, plaintiff charges her, in addition to certain silverware, utensils, and appliances of undetermined value, with the following:

| | | |
|---|---|---|
| Fur stole, he says "around" | | $ 700.00 |
| Rings | $500.00 or | 600.00 |
| Bonds, "around" | | 2,500.00 |
| Her (eventual) retirement withheld | | 2,000.00 |
| Stolen from bus company operation, | $5,500.00 to | 6,000.00 |
| Notes signed by both for money borrowed from defendant's mother | | 1,900.00 |
| | | $13,700.00 |

The total figure of $13,700 is apparently arrived at by taking the highest approximate amount in each instance.

■ We take this case *de novo* and decide it on the law and the facts as they appear to us. It is the recognized practice to give due deference to the court below in respect to the credibility of witnesses. Our great respect for the judicial acumen and learning of that judge in this case would

compel that deference. But we cannot say whether his decision in this case was based upon the confusing appellate court decisions in respect to whether the action on the counterclaim for accounting would lie at all (to which confusion this court has contributed) or whether it is based upon the evidence. If so upon the evidence, we observe that even after many rereadings and written detailed dissections of the confused and disconnected evidence in the transcript the task has been extremely difficult. For a trial court confronted with once-heard verbal testimony, it was virtually impossible.

■ *Did the wife have an interest in the garage business?* Under the facts peculiar to this case we think she did. There is a presumption (although it has been said to be a "weak" one) that the entirety interest follows the entirety funds. Allen v. Kelso, Mo., 266 S.W.2d 696, 703. But we base our opinion upon broader grounds than that. The interest or estate which W. T. and Gloria Ray held in the bank account, business, and other accumulations of their married life was a matter of intention. Ashbaugh v. Ashbaugh, 273 Mo. 353, 201 S.W. 72; Prasse v. Prasse, Mo., 77 S.W.2d 1001; Weber v. Jones, 240 Mo.App. 914, 222 S.W.2d 957; Schnur v. Dunker, Mo.App., 38 S.W.2d 282; Melinik v. Meier, Mo.App., 124 S.W.2d 594; Brooks v. Brooks, 357 Mo. 343, 208 S.W.2d 279, 4 A.L.R.2d 826; Builderback v. Builderback, 241 Mo.App. 508, 244 S.W.2d 377. In this instance we think it is immaterial as to what the *technical* character of the interests were, that is, whether they were tenants by the entirety, joint tenants, co-partners, joint adventurers, trustee and *cestui,* or what. Nor is their *conception* of their technically legal interest important as opposed to what they really intended *in fact.* The facts are that both parties devoted fifteen years of their married life in a joint and mutual effort at accumulating something they both expected to own together. Both worked and contributed their wages, she as much as he. Both put into the joint account. This joint account, either directly or indirectly, supplied the funds for the purchase first of the bus business and later of the garage business. Both contributed their extra hours to making the bus business a success, and later, although in different degrees, toward the garage business. The difference in respect to the garage business is that plaintiff had quit his job and she continued at hers and continued to supply the funds for the family sustenance and so obviated the necessity of greater withdrawals from the earnings of that business. The payroll savings bonds of both parties were taken in their joint names. We cannot read this transcript and escape the conclusion that throughout the years both parties worked and contributed the fruits of their physical and mental endeavors to a common end, the maintenance of a family and the accumulation of some substance for the future. This was what the parties thought they were doing and intended to do. This by their long-continued course of conduct became their marriage contract. They were truly *an entirety* in this common purpose, and we can find nothing in their conduct which indicates an intention other than to be partners and joint owners in all that their efforts produced. Their separate financial endeavors were like two streams of water which joined and flowed into a common pond, and, once having been joined, those interests became "as indistinct as water is in water." [6] We find nothing in the evidence (until the marriage broke up) to indicate that simply because the water was drained out of one pond and into another or lower one (from the joint moneys into the garage) they intended that the water should take on a different molecular construction so as to characterize it as belonging wholly to one or the other. It would be unjust and inequitable to permit either of the parties to walk away from the stricken marriage with all the assets which

6. Antony and Cleopatra, act IV, scene 12, line 9.

their joint efforts have accumulated. They should be divided equally. If a court of equity decides that one party has unjustly suffered financially from the acts of the other party to the marriage, it can enter into an accounting. Builderback v. Builderback, supra, 244 S.W.2d 377. This applies to all of the assets which had not been previously, by express or implied consent, given to one or the other.

The only evidence which we have as to the value of the one-half interest in the garage at the time of the exclusion (which was approximately the date of the separation) was the testimony of the plaintiff that the value of the business was "probably $7,000 or $8,000." Bearing in mind that at the time plaintiff asserted sole ownership of the one-half interest approximately a year had elapsed since the purchase of the business for a total of $20,000 and that during that year of operation it had shown a net profit of $4,013.29, and also having in view the fact that, according to plaintiff's testimony, he and his partner Brown had an agreed drawing account of $200 per month but that during that year plaintiff had withdrawn only approximately $1,050, we are inclined to believe that plaintiff's expression of value was as of date of trial (July 15, 1959) and not at the time he took over. If there had been a decrease in value it could be accounted for by the fact that, in the meantime, the plaintiff had incorporated a separate business and took the Chevrolet franchise to the newly incorporated company. The actual value of the complete Ray interest in the business so exclusively converted is so doubtful that we have no recourse but to remand the question to the trial court with directions to allow the defendant one-half of whatever that value may be found to have been at the time of the conversion.

■ The $1,500 withdrawn from the joint account on the approximate date of separation was not taken by express consent or acquiescence of the wife. Nevertheless, so much thereof as went to accom-plishment of the common purpose of the parties should be considered as taken by a running or implied acquiescence. The presumption that the entirety follows the proceeds and that the tenant who wrongfully appropriates the joint property holds as trustee for the other does not hold true where the withdrawals are expressly or impliedly authorized or when they are applied to the mutual benefit of the parties or to the accomplishment of the common purpose. In the latter instance we think there is usually a "built-in" acquiescence. Ambruster v. Ambruster, 326 Mo. 51, 31 S.W.2d 28, 37, 77 A.L.R. 782; Harrellson v. Barks, Mo.App., 326 S.W.2d 351, 360.

Kaufmann v. Kaufmann, 166 Pa.Super. 6, 70 A.2d 481, 484, contains a review of and quotations from various cases on this subject. One of them, from Berhalter v. Berhalter, 315 Pa. 225, 227, 173 A. 172, 173, is "The fund withdrawn is still subject to the legal status of the estate, and it has stamped on it in the hands of the one who withdrew it all the elements of a trust. Where both husband and wife have power to withdraw funds deposited in a joint account, the power must be exercised in good faith for the mutual benefit of both, and cannot be rightly exercised by the fraudulent withdrawal of the corpus of the funds for the exclusive use of one for the purpose of depriving the other of any use thereof or title thereto."

We think the payment of any income tax which the parties owed for the year 1957 or before should be considered the accomplishment of a common purpose and for mutual benefit and should be credited to the plaintiff. The evidence is too indefinite for us to find the amount, but it should not be difficult to ascertain on a rehearing. Plaintiff says he used part of the money to pay his lawyer. If the attorney was employed in connection with suing the defendant, or in reference to taking over the joint property—in other words, for a purpose antagonistic to the defendant—we think it can hardly be said to have been an expenditure for mutual benefit which would carry the

implied consent or acquiescence. The same thing would be true of moneys spent for detectives to shadow the wife.

■ As to the $400 balance received from the sale of the car taken in exchange for the family automobile and as to the household furniture (which plaintiff says was worth $1,000), we think the same rules apply. These were directly or indirectly derived from the joint account of the parties, who were engaged in a joint and mutual effort. Plaintiff should be held to account for one-half of such amounts.

■ The life insurance which plaintiff held (and to which he changed the beneficiaries) was paid for out of the joint money of the parties—their collective earnings. We think it was not intended as a present to the plaintiff but as a part of the whole joint endeavor to provide security for the family. Since the plaintiff has asserted his sole interest therein by changing the beneficiaries, we think he should be required to account for one-half the surrender value of the same.

■ The watch (value not shown) which plaintiff took from the room after the separation was, so plaintiff says, given defendant by another man. It can hardly be said that this watch was acquired by the joint effort of the parties. Nor can the discarded husband's anger at being the counterpart of a woman scorned vest in him any title or interest in gifts from the man at the opposite end of the triangle—especially after the separation of the parties. The plaintiff should be required to account for this conversion.

■ As to the husband's contentions which make up the $13,700 charged against the wife: He charges her with keeping certain bonds. There were some bonds purchased by the wife through the payroll plan. Nevertheless, they were payable to either or both plaintiff and defendant. These were a part of the accumulations of the joint and entire efforts of the parties, and we think

defendant should be charged with one-half their value. Plaintiff says they were worth "around $2,500." Defendant says she had payroll bonds which she cashed for $1,300. The exhibit which plaintiff produced had one column (plaintiff's payroll bonds?) showing thirty bonds of $25 maturity denomination, but it would appear that these bonds were cashed (for $795.49) and deposited in the joint account in February 1957, while the marriage was still a going concern. The second column lists twenty-five bonds of maturity denomination of $25 and eight at $100 (evidently defendant's payroll bonds). The total calculated maturity value of these bonds is approximately $1,425. These are the bonds which defendant says she cashed for $1,300, and this amount appears reasonable, since all of the bonds were not mature. In addition to this there were a small number of bonds in the joint names of defendant and the son of the marriage. These will be considered later.

Plaintiff baldly charges defendant with taking or hiding out "$5,500 or $6,000" from the bus business receipts. We find no evidence of such. We do find, however, that since 1952 defendant had maintained a savings account in her name and the name of the child. She said that the money came from her own pay checks and the purpose was to provide a college fund for the boy. We note this was after she quit buying bonds. By the time of the separation this account had grown to an excess of $4,500 and accumulations of interest had brought the total to $5,000. She says this account was shown on the financial statement of the parties when the garage was purchased, but there are circumstances from which the court could have believed that she did not fully inform her husband of this college account because she did not wish it risked in any business venture. Furthermore, the account was susceptible of her control and withdrawal, and after the separation she did withdraw $2,700 of this account, which, with the $1,300 obtained from cashing her payroll bonds, she used to buy an automobile to provide transportation to work. It is

a difficult decision, but under the theory we have of this case the tacit agreement and contract of the parties was to apply the whole of the salaries received by them during these years of mutual effort to the common purpose, even that which had not yet reached the common account. However creditable may have been the motive, the common purpose could not well have been a secret purpose of one of the parties. At any rate, she kept the account subject to her control and withdrawal and later did use part of it for her own purposes. This was a turning of that portion to her separate use and an act which impliedly asserted her right to withdraw the balance. We believe that she should be charged with one-half the amount of this separate account.

Even more difficult is the question of certain bonds in the amount of $400 in the name of Gloria M. Ray and Jerry Ray, the son of the marriage. There is no evidence to show where these bonds came from or how they were paid for. We think the evidence on these bonds is too sparse for us to say that defendant should be charged with them.

■ As to the $1,900 in notes which represent money borrowed from defendant's mother: This money was borrowed while the parties were still working as an actual entirety and before the marriage broke up. Both signed the notes. The record leaves the purpose of the borrowing somewhat indefinite. Probably it was to buy the new furniture; perhaps it was to put into the garage business; possibly it was to buy the family automobile which plaintiff later sold. Plaintiff strongly hints that it was to pay for defendant's extravagances; and it may be part of it went to pay for the fur stole to be hereinafter mentioned. Whatever the purpose may have been, it was the joint undertaking of the parties, presumably to accomplish some part of their common purpose. There is nothing to indicate it is not an honest debt. Although it might be convenient in many instances, we know of no rule of law which permits a man to charge against his wife the debts which he

might happen to owe his mother-in-law. These notes are an equal charge against both the parties, and neither is entitled to any credit for the same except whatever amount he or she has paid on them from separate funds.

■ Other items of plaintiff's claims against the defendant include some rings costing, he says, $500 to $600; exactly $360, she says. These, it appears, were purchased for the tenth wedding anniversary. She says he helped select the rings, and he admits it. There is also the fur stole, which cost, he says, "better than $700"; $680, she says. The only date we have on this purchase is that it was in October or November of 1956, more than a year before the marriage broke up. There is no claim that it was purchased secretly or against his will. The defendant counters these claims, although she has the good judgment not to claim any charge therefor or value thereon, with the fact that the plaintiff had extravagances in the form of a fancy field trial dog for which he hired a trainer and which he took to various shows. Likewise is mentioned his fishing and hunting equipment. To all these things we think there was acquiescence and consent. If it be necessary to say more, we suggest that the common purpose of any marriage usually includes the purchase of some items which give pleasure or contentment, or are useful, to the respective spouses. As to the comparative usefulness or extravagance of a fur stole and a good bird dog, and as between rings on the one hand and fishing and hunting equipment on the other, we suspect that if a vote were taken on the subject it would divide along strict party lines between the sexes. We prefer to straddle the fence on such momentous issues by voting in favor of both. We have heard from sources which we dare not dispute that a mink stole is good for the inner soul and contentment of the owner. We are quite certain that a good bird dog is. Be that as it may, these articles were bought before the marriage went on the rocks. There was, if not consent, at least acquiescence. They should be con-

sidered as gifts and the property of the respective recipients, free from the entirety and free from any accounting forever after.

■ There remains one other item with which the plaintiff seeks to charge the defendant, the retirement (which he says amounts to $2,000) defendant will or may draw at the end of her employment, whenever that may be. We are of the opinion that this future sum (whatever the amount may be) never was received and never became a part of the common property during the existence of the marriage, either in fact or by intention.

For the reasons we have set forth, this case must be reversed and remanded for further hearing and such further judgment as may be appropriate to the views herein expressed. It is so ordered.

STONE, P. J., and McDOWELL, J., concur.