**Agnes PELSUE, Plaintiff-Appellant,**

**v.**

**Wesley E. PELSUE, Jr., Executor of the Estate of Wesley E. Pelsue, Sr., Deceased, and Wesley E. Pelsue, Jr. and Patty Pelsue Lahmann, Defendants-Respondents.**

No. 49367.

Supreme Court of Missouri,

Division No. 1.

May 13, 1963.

488

Almon H. Maus, Edward V. Sweeney, Monett, for plaintiff-appellant.

Henry Warten, Joplin, for defendants-respondents.

HOLMAN, Commissioner.

In this equitable action plaintiff sought a decree to the effect that upon the death of her husband she became the owner of substantially all of the personal property thereafter inventoried as assets of his estate. The defendants are the executor of the estate of plaintiff's deceased husband and his two children by a former marriage. The trial resulted in a judgment in favor of defendants. Plaintiff has duly appealed.

Agnes Sweeney and W. E. Pelsue, Sr. were married on February 14, 1950. At that time Mr. Pelsue owned a mercantile business in the small town of Wentworth, Missouri, and Agnes Sweeney owned and operated a grocery business in the same town. Shortly after the marriage the Sweeney Grocery Store was closed and the assets of that business were moved to the building occupied by the Pelsue Mercantile Company. The merchandise and fixtures were combined, and all of the assets of the Sweeney Grocery, including accounts receivable, were merged into and became a part of the business operated as Pelsue Mercantile Company. Thereafter, plaintiff worked continuously in the operation of the business of the Pelsue store.

Mr. Pelsue died on April 27, 1959. Plaintiff continued to operate the store after her husband's death under some arrangement with the executor of his estate, W. E. Pelsue, Jr. Decedent's will was dated November 6, 1950, and was obviously prepared without the assistance of an attorney. Its terms were evidently unsatisfactory to plaintiff and she filed a timely renunciation of the will and elected, under the law, to take an undivided one-third interest in his estate.

The evidence indicated that both plaintiff and deceased bore good reputations for honesty and integrity. Their marriage was evidently a success as, throughout the years thereof, they appeared to be very close and amiable. They worked together, and consulted with each other a great deal in the operation of the business, in making decisions concerning the purchase of stocks, and in making loans to residents of that community. An employee of the store, Blanche Erwin, testified that when plaintiff moved her stock to the Pelsue store it was a large stock of groceries, although not quite as large as Pelsue's. She identified a letterhead used by the store which had the name "Pelsue Mercantile Company" in the center, and the name "W. E. Pelsue" in one corner and "Agnes Pelsue" in the other.

Hudson V. Binnington, an employee in the office of International Shoe Company, identified two financial statements signed by Mr. Pelsue, one dated January 20, 1956, and the other April 12, 1959, in which it was indicated that the Pelsue Mercantile Company was a partnership composed of W. E. Pelsue and Agnes Pelsue. Upon cross-examination this witness identified a financial statement dated January 21, 1955, also signed by decedent, in which it was indicated that W. E. Pelsue was the owner of Pelsue Mercantile Company.

At the time of their marriage Mr. Pelsue had two accounts in the First National Bank of Pierce City. These were entitled "Pelsue Mercantile Company" and "Pelsue's." These accounts continued until the time of decedent's death, upon which date the balance in the Mercantile account was $5,959.90, and the other account, $994.30. Both of those accounts were used in connection with the business and were subject to check by plaintiff, without restrictions. Blanche Erwin was also permitted to sign checks drawn on those accounts. At the time of the marriage plaintiff also had an account in the First National Bank at Pierce City. On April 1, 1950, she deposited $109.18 in her account which brought the balance to $6,000. That sum was then withdrawn from the bank and invested in U. S. Government bonds registered in the name of "Agnes E. or W. E. Pelsue, Sr." and the account was closed. Thereafter, on January 22, 1951, another account was opened in the First National Bank entitled "Ed or Agnes Pelsue." A few months later, the government bonds heretofore mentioned were cashed and the proceeds thereof deposited in the joint account and subsequently invested in certain corporate stocks.

Mr. Pelsue owned stock in a number of corporations at the time of the marriage. He continued thereafter to buy and sell stocks with considerable regularity until the time of his death. A number of the stocks owned at that time were paid for by checks drawn upon the joint account, and likewise, the proceeds from the sale of various issues of stocks were deposited in said account. Some of the stocks purchased, however, were paid for, in whole or in part, by checks drawn on one or the other of the two accounts used in connection with the operation of the mercantile business. After decedent's death it was discovered by plaintiff that substantially all of the stocks which her husband had purchased were registered in his individual name.

Mr. Pelsue had two adult children by a previous marriage. A few days after his death, his son was appointed executor of the estate and he and his attorney called for plaintiff and took her to the bank in Pierce City. At that time the joint safety deposit box was opened and the contents thereof inventoried. The executor took possession

of the stocks registered in the name of Mr. Pelsue and also had the two commercial bank accounts transferred to his name. He testified that at that time plaintiff made no claim of ownership to the stocks. Harlin Moore, cashier of the bank, testified that he heard no claim or objection on the part of plaintiff.

Plaintiff was offered as a witness, but the defendants invoked the "Dead Man's Statute" and the court sustained their objection to testimony concerning anything that occurred before the probate of the will and appointment of the executor. She was permitted to testify, however, concerning the visit to the bank, and she stated that she did protest "loudly" concerning the way the stocks were registered, although "at first I was so grieved and overcome that I hardly knew what to say." She also testified that she said to Mr. Forsythe, president of the bank, "Who is the Pelsue Mercantile?" and that he replied, "I presumed all the time it was you and Edward."

There were also a number of witnesses who testified that Mr. Pelsue used the word "we" in referring to the mercantile business, and sometimes "Agnes and I" in referring to stocks that were bought and sold. A sales tax return of Pelsue Mercantile Company for the first quarter of 1958 was admitted in evidence. It was signed by Agnes Pelsue as individual owner and notarized by W. E. Pelsue, Sr., and a similar return for the first quarter of 1959 was also admitted. However, a number of other sales tax returns were offered by defendants and admitted by the court which showed that W. E. Pelsue signed as individual owner of the business during the years plaintiff was married to him. Also, the federal income tax returns for the years following the marriage were all signed by W. E. Pelsue individually and showed that he was the owner of the business, with the exception of the year 1958, when a joint return was filed by plaintiff and Mr. Pelsue. However, it was stated on the business schedule on that return that Mr. Pelsue was the owner of the business.

Rolla C. Hill was offered as a witness by defendants. He testified that he was a credit investigator for Dun & Bradstreet and on January 4, 1960, talked with plaintiff in regard to the annual report concerning Pelsue Mercantile Company; that she told him the business was in an estate and that she intended to purchase it from the heirs.

Plaintiff, in her second amended petition, sought to establish title to the assets in question upon allegations involving three theories: (1) That she and decedent, prior to or at the time of their marriage, entered into a parol agreement to commingle and combine their separately owned country stores and jointly operate the same, and to combine their investments and to hold the same and the proceeds thereof as tenants by the entirety, or in survivorship estate, and that such agreement was performed by plaintiff; (2) that the property in question was acquired by Agnes Pelsue and W. E. Pelsue, Sr. while husband and wife and under such circumstances that title thereto vested in them as tenants by the entirety, or in a survivorship estate; and (3) that plaintiff is the owner of all of the corporate stocks that were purchased with funds that had been deposited in the joint bank account of decedent and plaintiff. The properties which plaintiff claims in this action are corporate stocks inventoried at a value of $34,629.50, bank accounts in which were deposited the total sum of $6,904.20, and the merchandise and fixtures of the store which were inventoried at a value of $16,250.

■ We have jurisdiction of this appeal by reason of the amount in dispute, which is the difference between the total value of the assets herein mentioned and one third of said assets. The value of a two-thirds' interest in said assets is clearly in excess of $15,000.

■■ This suit is in the nature of specific performance. Among other defenses defendants pleaded the statute of frauds, and certain statutes relating to marriage contracts. Sections 432.010, 451.220, and

451.230, RSMo 1959, V.A.M.S. Plaintiff sought to avoid the force of those statutes by pleading full performance on her part. Plaintiff is required to prove her case by convincing evidence, and, it has been said that "(1) the alleged oral contract must be clear, explicit, and definite; (2) it must be proven as pleaded; * * *." Walker v. Bohannan, 243 Mo. 119, 147 S.W. 1024, 1028.

■ Plaintiff's first point is that the court erred in failing to find for her because the evidence established that she and decedent agreed to combine their assets and to jointly operate their business and hold their investments "as tenants by the entirety or in a survivorship estate." We have concluded that the evidence is not sufficient to warrant a finding of any such agreement. Plaintiff frankly concedes that, by necessity, she has been required to present her case in "bits and pieces." These "bits and pieces" may have tended to indicate some sort of agreement but are not sufficient to measure up to the "convincing evidence" required to establish the agreement pleaded.

■ It is true that plaintiff transferred her grocery business to Pelsue Mercantile Company and apparently was never compensated for it. In his will decedent stated that she had put $2,500 into the business. The evidence of Blanche Erwin would appear to indicate that the amount may have been more. Also, during the month of his death decedent signed a credit statement indicating that the business was held as a partnership. We do not regard the fact that decedent used the pronoun "we" in referring to the business activities of himself and plaintiff as of much significance. The fact that plaintiff worked regularly in the operation of the business is not convincing proof of the agreement pleaded, as that fact may just as reasonably be attributed to the marriage relationship.

As we view the testimony herein and the many exhibits admitted in evidence, we find no evidence, either direct or circumstantial, to indicate an agreement to the effect that the assets were to be held as tenants by the *entirety* or other *survivorship* estate. As stated, there was evidence which would tend to support a finding of some type of partnership. Plaintiff has also cited cases (Brooks v. Brooks, 357 Mo. 343, 208 S.W. 2d 279, 4 A.L.R.2d 826; Fish v. Fish, Mo. App., 307 S.W.2d 46) relating to the establishment of a joint adventure in business enterprises operated by a husband and wife. However, we must bear in mind that plaintiff did not allege a partnership or joint adventure but sought to recover solely upon an agreement that the assets would be held as tenants by the entirety or other survivorship estate. It should also be noted that she does not seek to recover the value of the assets she contributed to the business upon any theory relating to trusts. Since the evidence does not support the agreement pleaded, we must rule, as indicated, that plaintiff was not entitled to recover upon the basis of such an agreement.

■ Plaintiff's next contention is that even in the absence of proof of an agreement, the facts and circumstances surrounding the merger of the businesses, and the operation of Pelsue Mercantile, were such that the trial court should have held that such assets were held by plaintiff and decedent as tenants by the entirety—that their ownership thereof was presumed to be such a tenancy. We do not agree. Plaintiff has cited the cases of Lomax v. Cramer, 202 Mo.App. 365, 216 S.W. 575, and Glynn v. Glynn, Mo.App., 291 S.W.2d 190, but they are distinguishable on the facts. Lomax involved a determination of testator's intent in making a devise to a husband and wife. Glynn involved a written assignment on a note to a husband and wife. It may well be that if some third party had owned the mercantile business and had conveyed it to plaintiff and decedent by a bill of sale, such would have been presumed to have created a tenancy by the entirety. However, the facts and circumstances shown in this record are not sufficient to raise any presumption that the business was owned by

plaintiff and her husband as tenants by the entirety. We accordingly rule this point adversely to plaintiff.

The final point briefed by plaintiff is that the court erred in failing to find that she was the owner of the corporate stocks purchased with funds drawn from the three bank accounts allegedly owned by plaintiff and decedent as tenants by the entirety. At the outset of our consideration of this contention, we rule, for reasons heretofore stated, that the bank accounts in the name of "Pelsue Mercantile Company" and "Pelsue's" were not accounts owned by plaintiff and decedent as tenants by the entirety. However, the "Ed or Agnes Pelsue" account was clearly a joint account and we rule that the funds deposited therein were held by said parties as tenants by the entirety.

Many difficult questions have arisen concerning the right of a depositor to withdraw and appropriate funds held in a joint account. A discussion of the nature of the relationship created where a husband and wife hold funds in a bank account as tenants by the entirety appears in Ambruster v. Ambruster, 326 Mo. 51, 31 S.W.2d 28, 37, 77 A.L.R. 782, as follows:

"Taking a common sense view of the matter, if a husband and wife have a joint bank account, either or the survivor to draw, and therefrom he buys a suit of clothes or an automobile, or she a dress or some jewelry, it would seem forced and unnatural to say the purchaser becomes a trustee for the other spouse as to a joint interest in the property. An accounting of the multitude of transactions that would arise in the family relation would be complicated indeed. The very fact that each is given the separate right to draw on the account would seem equivalent to a sort of standing permission to appropriate parts of the fund from time to time, especially considering the provision in the statute giving either party the right to terminate the drawing privilege by giving notice to the bank.

"On the other hand, the arrangement is loose and affords opportunity for injustice and overreaching. And logically, if the parties have a joint interest in the bank account, they ought to have a like interest in property in which the joint funds are invested—nothing further appearing. In our opinion the rule announced in the New York case, Moskowitz v. Marrow, supra, 251 N.Y. 380, 167 N.E. 506, [66 A.L.R. 870] is correct and best fits the peculiar relation created by a banking arrangement of this character. That rule is, as we have stated, that the joint form of the account, either or the survivor to draw, of itself alone raises a presumption of fact, or inference, that the joint interest of the depositors follows funds withdrawn by either and negatives the idea that such withdrawals were severed from the joint estate and appropriated by the drawer to his own use. But the presumption is a weak one and readily yields to parol proof of the real intention of the parties. And while it makes a prima facie case for the party asserting the joint interest, the burden of proof is on him to establish his title by a preponderance of all the evidence."

A rule which would solve many of the questions arising in regard to withdrawals is stated in Harrellson v. Barks, Mo.App., 326 S.W.2d 351, 361, as follows: "It would seem that the practical, and therefore better, rule to follow in regard to withdrawals from entirety accounts would be this: Where the withdrawals are partial and not obviously to obtain unfair ownership or advantage, and where the purpose of the withdrawal can reasonably be considered as one which could suit the wishes, purposes, and intention or consent of both the owners of the entirety account, and there is no apparent objection after the withdrawal is known, then the *presumption* should be that the withdrawal was by consent and agreement of the joint owners."

We have concluded that under the facts and circumstances here presented, the entirety interests of plaintiff and decedent

followed the funds withdrawn from the "Ed or Agnes" account that were used to pay for corporate stocks purchased, and that all such stocks inventoried in Mr. Pelsue's estate which were paid for with funds withdrawn from said account, were, in equity, owned by plaintiff and decedent as tenants by the entirety. The entirety interest of any stocks paid for in part by funds withdrawn from said account would be a prorata interest, i. e., the proportion that the amount paid from the account in question would bear to the total purchase price of the particular stock. Upon the death of Mr. Pelsue the sole ownership of said stocks vested in plaintiff.

 In arriving at the foregoing conclusion we find as a fact that plaintiff did not know that her husband had caused said stocks to be registered in his individual name until the safety deposit box was opened after his death, and that she immediately protested in regard thereto. We think the action of decedent in withdrawing said funds to purchase stocks to be registered in his sole name was the taking of an unfair advantage of plaintiff and was a means of obtaining an ownership in the stocks to which he was not entitled. Under the facts before us, there would certainly be no presumption that the withdrawals (for the purchase of stocks to be registered in the individual name of decedent) were made by the consent and agreement of both plaintiff and her husband.

The parties have stipulated as to most of the facts concerning the various transactions in which decedent purchased stocks and the source of the funds from which payments were made. Inventoried as an asset of the estate are 277 shares of stock of Warren Brothers Company. Two hundred fifty shares of that stock were purchased on July 21, 1954, at a cost of $7,500, all of which was paid by a check drawn on the "Ed or Agnes" account. The other 27 shares represent stock dividends. We rule that plaintiff is the equitable owner of said 277 shares of stock.

On June 14, 1955, Mr. Pelsue purchased 50 shares of Oregon Portland Cement Company at a cost of $2,512.50. Stock splits and dividends had caused the number of these shares to increase to 228 at the time of decedent's death. Plaintiff claims a proportionate interest in that stock. The payment therefor was combined with the payment for 400 shares of Holland Furnace which Mr. Pelsue purchased on June 13, 1955, for $6,333.17. These two purchases were paid for by the sale of certain other stock and by various checks, including one for $4,500 on the "Ed or Agnes" account. Since $4,500 of the total payment of $8,845.67 came from the amount in question, it would follow that plaintiff has a 50.87% interest in the 228 shares of the Oregon Portland stock.

Plaintiff also claims an interest in 300 shares of River Brand Rice Mills, Inc. which were purchased on January 22, 1957, for $5,962.50. On the same day there was a purchase of 300 shares of Frisco Railroad stock (which was sold shortly before decedent's death) for $7,545.47. These purchases totaled $13,507.97. That amount was paid by the sale of 400 shares of Holland Furnace stock for the sum of $4,124.26, 400 shares of Delhi-Taylor stock which sold for $5,549.80, checks on the "Pelsue Mercantile" and "Pelsue's" accounts totaling $1,833.91, and a check on the "Ed or Agnes" account for $2,000. The Holland stock had been paid for out of the entirety account to the extent of 50.87%. Therefore, plaintiff should be credited with that percentage of the proceeds of the sale of that stock, i. e., $2,098.01. Eight hundred dollars from the entirety account went into the $5,850 purchase price of the Delhi-Taylor stock. Plaintiff should therefore be credited with 13.67% of the sale price of that stock, i. e., $758.66. Plaintiff's credits for the Delhi and Holland stock sales, together with the $2,000 check, makes a total of $4,856.67 which the entirety account contributed to the Frisco and River Brand purchases. Plaintiff is therefore the equi-

table owner of 35.95% of the 300 shares of River Brand Rice stock.

 As we have indicated, plaintiff is entitled, prorata, to that portion of the three issues of stock heretofore discussed which were paid for, directly or indirectly, from the entirety account, and the executor should be required to transfer the same to her. Plaintiff is also entitled to all cash or stock dividends (or so-called "splits") paid or issued, since the date of decedent's death, on the stock to which she is entitled.

The judgment is reversed and the cause remanded with directions to the trial court to enter a judgment in accordance with the views herein expressed.

COIL and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.